**Donald L. MUNSON et al.,
Plaintiffs,**

v.

**ORRIN E. THOMPSON HOMES,
INC., et al., Defendants.**

**No. 4–74–Civ. 196.**

United States District Court,
D. Minnesota,
Fourth Division.

Nov. 18, 1974.

**154**

Fred Burstein and Gregg M. Corwin, McMenomy, Hertogs & Fluegel, Minneapolis, Minn., for plaintiffs.

Charles Quaintance, Jr., and David Karan, Maslon, Kaplan, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., for defendant Thompson.

Samuel L. Hanson, Briggs & Morgan, St. Paul, Minn., for defendant Northern States Power Co.

## MEMORANDUM

LARSON, District Judge.

Defendant Northern States Power (NSP) and defendants Orrin E. Thompson Homes, Inc., and Orrin E. Thompson Construction Corporation (Thompson) move for summary judgment of the claims asserted against them by 85 named plaintiffs for alleged violations of the Truth in Lending Act, 15 U.S.C. § 1601 et seq. Jurisdiction of this Court is properly found under 15 U.S.C. § 1640 (e).

A motion of the plaintiffs to establish a class action under Rule 23 of the Federal Rules of Civil Procedure was under advisement at the time the summary judgment motions now before the Court were heard. Because the Court grants summary judgment in favor of both defendants, it is unnecessary to render a decision upon the petition of the plaintiffs to be certified as a class.

The named plaintiffs are persons who have purchased homes constructed by Thompson, a developer and construction contractor, in four tracts of residential housing in the communities of Cottage Grove and Stillwater, Minnesota. Defendant NSP supplies electrical power to these homes.

Plaintiffs assert that the defendants have violated the disclosure provisions of the Truth in Lending Act with regard to the cost of installing underground electrical power and utility facilities to all homes that Thompson has constructed in these areas since the fall of 1969. Prior to 1969 all Thompson homes were designed for overhead electrical service. In response to a new ordinance of the Village of Cottage Grove requiring underground electrical systems in all fu-

ture developments, Thompson entered into a series of underground installation agreements with NSP that first took effect in the summer of 1969.

These agreements set forth that NSP would install, own and maintain all the facilities necessary to establish an underground electrical distribution system at no cost to Thompson. The cost was to be borne by the eventual purchaser of the home.

This cost was passed on to the home buyer and consumer of electricity according to three different schedules. Beginning on July 1, 1969, NSP established a separate rate schedule for customers who were served by underground electrical distribution systems. The rate added a $2.00 a month surcharge to the customer's bill. A second rate schedule took effect on September 11, 1969, and continued until March 19, 1974. Under this schedule, a 30 year limitation was placed upon the imposition of the $2.00 surcharge. As an alternative to paying this monthly surcharge, the customer could pay a lump-sum payment of $220.00 and relieve himself and any future owner of that residence of the $2.00 monthly surcharge. The third rate schedule took effect on March 19, 1974, and removed the $220.00 lump-sum option, while retaining the $2.00 surcharge for individuals who had an underground electrical system. Under the third rate schedule, the surcharge became part of the basic rate charged for electrical service and was payable indefinitely with no 30 year limitation.

For purchasers of homes with underground electrical systems who did not elect the $220.00 lump-sum payment, NSP added $2.00 to their monthly bill. However, until January 1, 1973, NSP's periodic monthly billings did not separately disclose this charge; it was just included in the overall bill. Nor was the $220.00 lump-sum or $2.00 per month for 30 years option set forth in the monthly bill. The option and the explanation of the surcharge was filed with the Mayor and Village of Cottage Grove, as are all rate changes and schedules of NSP.

Plaintiffs assert that the difference between the total charge of $720.00 paid by the consumer choosing the $2.00 per month for 30 years option and the $220.00 lump-sum payment, or $500.00, is a finance charge. They contend that NSP and Thompson violated the Truth in Lending Act by failing to disclose this extension of credit to the consumer prior to its being offered. Additionally, they contend that NSP violated the Regulations enacted under the Act, 12 C.F.R. § 226.1 et seq., by not disclosing the $2.00 fee in the periodic billings and by not disclosing the annual percentage interest rate for those choosing the $2.00 per month for 30 years option.

The relief sought by plaintiffs in this lawsuit is set out in 15 U.S.C. § 1640. It states:

> "§ 1640. *Civil liability—Failure to disclose*
>
> (a) Except as otherwise provided in this section, any creditor who fails in connection with any consumer credit transaction to disclose to any person any information required under this part to be disclosed to that person is liable to that person in an amount equal to the sum of
>
> (1) twice the amount of the finance charge in connection with the transaction, except that the liability under this paragraph shall not be less than $100 nor greater than $1,000; and
>
> (2) in the case of any successful action to enforce the foregoing liability, the costs of the action together with a reasonable attorney's fee as determined by the court."

Defendant NSP moves here for summary judgment on three grounds. First, NSP asserts that the $2.00 monthly surcharge or the $220.00 lump-sum payment is not a "credit sale" within the meaning of 15 U.S.C. §§ 1602(e), (g) and § 1631 and the appropriate regulations set forth in 12 C.F.R. § 226.2. Second,

NSP contends that even if the above described transaction constitutes a credit sale, that NSP as a public utility is exempt from the provisions of the Truth in Lending Act, as this is an exempted transaction under 15 U.S.C. § 1603. Finally, NSP asserts that the statute of limitations bars the plaintiffs' cause of action.

15 U.S.C. § 1602(e) and (g) set forth the definitions of credit and credit sale that are pertinent to this case. They state:

" *   *   *   *   *   *

(e) The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment.

*   *   *   *   *   *

(g) The term 'credit sale' refers to any sale with respect to which credit is extended or arranged by the seller. The term includes any contract in the form of a bailment or lease if the bailee or lessee contracts to pay as compensation for use a sum substantially equivalent to or in excess of the aggregate value of the property and services involved and it is agreed that the bailee or lessee will become, or for no other or a nominal consideration has the option to become, the owner of the property upon full compliance with his obligations under the contract."

The characterization of this transaction is not easily ascertained. The plaintiffs urge that this is a "credit sale" and that a debtor-creditor relationship exists between plaintiffs and defendants. NSP asserts that the option of a $220.00 lump-sum payment in lieu of the $2.00 monthly surcharge for 30 years does not constitute a right to defer payment of a presently enforceable obligation but rather it offers the customer the right to prepay for future services.

The transaction and its results do not have the appearance or the conditions normally equated with a sale of equipment. The plaintiff-consumer does not own the underground lateral equipment. The agreements between NSP and Thompson set forth that NSP shall install, own and maintain all facilities necessary to provide adequate underground electricity distribution. The plaintiff-consumer also does not have a continuing personal obligation to pay this monthly surcharge. He is responsible to pay it only for as long as he continues to receive electrical service. If he discontinues his electrical service or moves to another area not served by an underground distribution system, he is not obligated to continue paying this monthly surcharge.

■   It appears therefore to the Court that this transaction is neither a "sale" nor really a direct "service" charge. It appears to be best characterized as a lease type arrangement with the plaintiff-consumer being extended the option to either pay for his lease at one time or to pay for the utilization of this equipment over the period of time he is actually using it.

■   It is clear that the Truth in Lending Act did not intend to include leases as transactions that were to be covered under the Act, 15 U.S.C. § 1602 (g). The United States House of Representatives Report on this section of the bill, in defining what constituted a "consumer credit sale," stated:

"The definition of credit sale is also limited to include leases only if they are, in essence, disguised sale arrangements." House Report No. 1040, Dec. 13, 1967, 90th Congress, Second Session (1968 U.S.Code Cong. and Admin. News at p. 1980).

The history of this surcharge also lends weight to the conclusion that it was not designed to provide for the purchase of equipment, and therefore it cannot be considered as a sale type transaction. The initial $2.00 monthly surcharge was established to cover the additional costs incurred to provide electrical service to the homes in the Cottage Grove area required to have underground distribution systems. When NSP received a number of complaints about this

surcharge from the municipalities in which these underground systems were being installed, it established the second rate schedule which allowed the $220.00 lump-sum payment and also limited the $2.00 monthly surcharge to 30 years duration. In March 1974, because of the confusion over the lump-sum option and because of the increased costs realized in the installation of the underground systems, NSP established a separate underground residential distribution rate that does not set forth the underground surcharge as a separate charge. In this new rate, the additional cost of providing underground instead of overhead service is part of the steps of the rate.

■ The Court therefore finds that the additional costs associated with the underground distribution system does not constitute a "credit sale" within the meaning of 15 U.S.C. § 1602. Further, the Court finds that the difference between paying a $220.00 lump-sum and a $2.00 monthly surcharge for 30 years is not a finance charge within the meaning of the Truth in Lending Act.

The Court is aided in this latter finding by several Public Information Letters issued by the Federal Reserve Board pursuant to its statutory authority under 15 U.S.C. § 1604 to promulgate regulations necessary to render the Truth in Lending Act effective. The Board found in the following letters that the situations described therein did not involve credit and therefore were not subject to the provisions of the Act:

1. Discount for early payment of ad valorem taxes, Public Information Letter No. 40, July 14, 1969.

2. Payment of sewer assessments in more than four installments with interest, Public Information Letter No. 153, October 15, 1969.

3. Payment of assessments for conversion of overhead transmission lines to underground facilities, Public Information Letter No. 385, July 29, 1970.

■ Further, the fact that the consumer can prepay his surcharge by a lump-sum payment of $220.00 does not render the $2.00 per month charge "credit." Unless there exists an underlying debt and an obligation to make full and complete payment, a "credit" situation does not arise. The Federal Reserve Board addressed a similar situation in Public Information Letter No. 583, March 15, 1972. The letter states:

"March 15, 1972

"Your letter of March 10, 1972, poses the following problem. A State employees association has dues of $12 per year if paid before January 31, otherwise the dues are $15 per year and $1.25 per month is withheld from the salary of the member. The question is whether the additional $3.00 for monthly payment is a finance charge.

"The staff does not believe the additional $3.00 is a finance charge since there is no debt associated with the deferred payment. *Should an employee terminate his employment during the course of the year, he would presumably have no further obligation to make the monthly instalments.* The individual's membership in the association would simply be terminated. Consequently, we do not believe the deferred payment of dues creates the debtor-creditor relationship required before a transaction becomes subject to Regulation Z under § 226.2(k) and (*l*) of the Regulation." (Emphasis added.)

■ NSP asserts as an additional or alternative ground in its plea for summary judgment that as a public utility it is exempt from the provisions of the Truth in Lending Act under the exemption provision of 15 U.S.C. § 1603. That section states:

"This subchapter does not apply to the following:

\*  \*  \*  \*  \*  \*

(4) Transactions under public utility tariffs, if the Board determines

that a State regulatory body regulates the charges for the public utility services involved, the charges for delayed payment, and any discount allowed for early payment."

12 C.F.R. § 226.3(d) expands upon the statutory language. It states:

"(d) *Certain public utility bills.* Transactions under public utility tariffs involving services provided through pipe, wire, or other connected facilities, if the charges for such public utility services, the charges for delayed payment, and any discount allowed for early payment are filed with, reviewed by, or regulated by an agency of the Federal Government, a State, or a political subdivision thereof."

Each of the rate schedules here in question was filed with the Village of Cottage Grove. The second rate schedule was established in response to questions raised by the officials of Cottage Grove after they had reviewed the first rate schedule. It appears, therefore, that NSP has complied with the requirements of 15 U.S.C. § 1603(4) and that these transactions should be exempt from the disclosure provisions of the Truth in Lending Act.

However, the Federal Reserve Board has issued several conflicting Public Information Letters on this exemption provision. In Public Information Letter No. 67, August 18, 1969, the Board held that in a situation where a public entity owned and operated its own electric plant, that a penalty charge for late payment of the electrical bill was not covered under the Act. In Public Information Letter No. 524, September 13, 1971, the Board determined that it would not determine whether any particular utility transaction was subject to the Act but stated that an "objective test" against which all public utility transactions could be measured should be applied to determine whether the disclosure provisions of the Act should be complied with.

In Public Information Letter No. 692, June 27, 1973, the Board drew a distinction between public utility charges for connected services and those for the installation of the equipment necessary to bring those services to the consumers. The Board stated:

"This is in response to your letter of May 21, 1973, questioning whether credit transactions under ——— issued by the ——— are exempt from Regulation Z pursuant to the provisions of § 226.3(d). General Order No. 52 relates to the charges which ——— electric utilities may levy on consumers for new electric lines, poles, meters, and associated equipment in connection with the extension of utility services into new areas. One of the options for paying for such extensions includes an instalment agreement for which the maximum finance charge and maturity are set by the ———.

"It is the staff's opinion that credit transactions under General Order No. 52 would not be exempt from the provisions of Regulation Z. Section 226.-3(d) relates to services provided *through* pipe, wire or other connected facilities. The exemption does not apply to the installation of the pipes, wires, or other connected facilities through which such services are provided. Furthermore, inasmuch as a long term instalment contract providing for finance charges is involved, it would seem that the disclosures required by Regulation Z would benefit the consumer."

There are several aspects not set forth in this Public Information Letter that distinguish the situation discussed there from the case before the Court. The Letter does not state who the "owner" of these facilities would be after the installation. Second, the Letter alludes to a long term installment contract providing for the financing of this equipment. The Court finds no such long term installment contract in the case before it.

The Court therefore finds on the basis of the language of the statute and the Code of Federal Regulation and by ap-

plying the "objective test" as set forth in Public Information Letter No. 524, that this transaction is exempt from the provision of the Truth in Lending Act.

NSP asserts as a third ground in its motion for summary judgment that even if it has been guilty of a violation of the Act, plaintiffs' claim is barred by the statute of limitations set forth in 15 U.S.C. § 1640(e). That statute states:

> "Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation."

In Wachtel v. West, 476 F.2d 1062 (6th Cir. 1973), cert. denied 414 U.S. 874, 94 S.Ct. 161, 38 L.Ed.2d 114 (1973), the Sixth Circuit held, in a split decision, that a credit transaction which requires disclosure is completed when the parties contract for the extension of credit. The Court found that any violation of the disclosure requirements occurs, at the latest, when the parties perform on that contract and that the limitations of an action for damages begins to run from the date of performance.

In *Wachtel* the plaintiffs borrowed money from the defendant on October 28, 1970. The complaint was filed on April 25, 1972, and sought a damage recovery under 15 U.S.C. § 1640. The majority opinion found that the statute of limitations began to toll on the day the money was borrowed and not on the day the plaintiffs became aware of the failure of the defendant to make the proper disclosures required by the Act. The Court stated that:

> " . . . the right of rescission seem[s] to contemplate a continuing violation when the disclosures are not made, but such is not the case when damages are sought." *Ibid.* at 1066.

Therefore, the Court upheld the lower Court's decision that the plaintiffs were barred by the one year statute of limitations set forth in 15 U.S.C. § 1640(e).

Judge Young, dissenting in *Wachtel*, stated that the date of the formation of the contract should not be the tolling point for the statute of limitations when there is a continuing violation of the Truth in Lending Act. He argues:

> "As a general rule, statutes of limitation in actions for fraud commence to run at the time when the fraud is discovered, not when the fraudulent acts occurred. Basically, the statute involved here is designed to prevent frauds being perpetrated by sophisticated lenders upon uninformed borrowers. It would therefore appear that these general principles should be applied to the limitation period in the statute here involved. . . .
> "I would hold that the one year limitation did not commence to run until the plaintiffs discovered the defendants' violation of the statute and made the demand for rescission which was refused by the defendants." *Ibid.* at 1066–7.

This Court would be inclined to agree with Judge Young. However, it appears that the majority opinion in *Wachtel* is controlling on this issue and the Court feels bound by it.

■ The complaint in this cause of action was filed on April 10, 1974. If it were found that NSP had extended credit to the plaintiffs, there are two points in time at which it could be argued that a "contract" was formed between NSP and the plaintiffs. The first would be when plaintiffs first used NSP's underground service which would be some time during the summer or fall of 1969. The second would be the date that the customers were first individually notified as to the existence of the surcharge during the month of January 1973. Regardless of which is more appropriate, both took place more than one year before the cause of action in this case was filed. Therefore, under the majority opinion of Watchel v. West, *supra*, plaintiffs' cause of action in this lawsuit is barred by the statute of limitations set forth in 15 U.S.C. § 1640(e).

Plaintiffs have also sued defendant Thompson in this cause of action as-

serting that Thompson has arranged for credit to be extended to its customers in Cottage Grove. Plaintiffs allege that prior to the fall of 1969, Thompson paid NSP $50.00 per lot for underground utility installation. Plaintiffs further assert that beginning in the fall of 1969, Thompson, through its agreements with NSP, passed this cost on to the consumer. Plaintiffs also allege that Thompson had knowledge of the $220.00 lump-sum or $2.00 per month for 30 years option being extended to these home buyers. Therefore, plaintiffs conclude that Thompson was an "arranger of credit" within the meaning of 12 C.F.R. § 226.2 (f) and liable under the Truth in Lending Act.

Defendant Thompson joins with the summary judgment motions of defendant NSP. It also asserts that it is not an "arranger of credit," in its own motion for summary judgment. As the Court has found that this transaction does not constitute a "credit sale" within the meaning of 15 U.S.C. § 1602, *a fortiori* Thompson cannot be held liable here.

■ However, even if the Court had found that a "credit sale" did exist here, Thompson could not be found an "arranger of credit." 12 C.F.R. § 226.2(f) states:

"(f) 'Arrange for the extension of credit' means to provide or offer to provide consumer credit which is or will be extended by another person under a business or other relationship pursuant to which the person arranging such credit receives or will receive a fee, compensation, or other consideration for such service or has knowledge of the credit terms and participates in the preparation of the contract documents required in connection with the extension of credit. It does not include honoring a credit card or similar device where no finance charge is imposed at the time of that transaction."

Thompson as a builder of homes in Cottage Grove had no control over NSP in its manner of billing its customers or of the cost of that electrical service. The determination of what charges should be made and of what form it should take were matters solely within the province of NSP, the municipality and the consumer. Thompson merely designed the homes it was building to accomodate underground utility connections and contracted with NSP, the sole provider of electrical service in the area, to make the necessary underground installations as required by the ordinances of Cottage Grove.

Even if it were argued that Thompson had "knowledge" of the terms of the alleged "credit sale," there is no evidence before the Court that Thompson actively participated in the formation of the rate schedules as would be required to hold Thompson liable as an "arranger of credit."

Finally, it is apparent that Thompson did not receive any fee or "other consideration" in regard to the installation of the underground system. Plaintiffs assert that as a result of the arrangements with NSP beginning in the summer of 1969, Thompson was no longer obligated to pay the underground installation fee. This action, plaintiffs allege, relieved Thompson of the obligation to pay this fee and therefore constitutes "other consideration."

■ There is no evidence presently before the Court that Thompson was ever obligated to pay any fees for the installation of underground wiring. Additionally, even if the developer was relieved of the obligation to pay this fee, it still does not constitute "other consideration" within the meaning of the regulations. Public Information Letter No. 301, April 16, 1970, addressed this issue. In that Letter, the Federal Reserve Board stated:

"It was our intent in drafting Regulation Z [12 C.F.R. § 226.1 et seq.] that the term 'other consideration' would refer to tangible payment corresponding to a fee or similar compensation."

There is no record of any direct compensation flowing from NSP to Thompson as a result of these transactions. Therefore it cannot be said that Thompson received any "other consideration" within the meaning of 12 C.F.R. § 226.2 (f).