In re Gladys M. BUCKLES, Debtor.

**THORP LOAN AND THRIFT CO., d/b/a ITT Financial Services, Plaintiff,**

v.

**Gladys M. BUCKLES, Defendant.**

**Bankruptcy No. 3–91–3253.
Adv. No. 3–91–155.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Dec. 4, 1995.

James A. Lee, Southern Minnesota Regional Legal Service, Inc., Minneapolis, MN, for defendant.

Daniel W. Stauner, Stein & Moore, P.A., St. Paul, MN, for plaintiff.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

GREGORY F. KISHEL, Bankruptcy Judge.

This adversary proceeding came on before the Court for trial. The Plaintiff ("ITT") appeared by its attorney, Daniel W. Stauner. The Defendant ("the Debtor") appeared personally and by her attorney, James A. Lee, Southern Minnesota Regional Legal Services. Upon the evidence adduced at trial, counsel's pre-and post-trial briefs and argument, and the other files, records, and proceedings herein, the Court makes the following decision.

## NATURE OF PROCEEDING

This is an adversary proceeding for certain declaratory, legal, and equitable relief. It arises out of two disbursements of funds that ITT made to the Debtor in 1990. The threshold issues are whether ITT violated the Truth–In–Lending Act, 15 U.S.C. §§ 1601 *et seq.*, or the Minnesota Regulated Loan Act, MINN.STAT. c. 56, in the transaction(s) between the parties. The outcome of these issues will determine whether the Debtor had the right to rescind the transaction(s); whether, in consequence of that rescission, she is entitled to have ITT's mortgage against her homestead real estate satisfied of record; whether any such rescission should be conditioned upon her tender to Plaintiff of the amount she borrowed; and whether, independent of the rescission-related issues, the Debtor is entitled to an award of statutory damages from ITT. The joinder of these issues in the context of the Debtor's bankruptcy case, after the discharge of her legal indebtedness to ITT, presents a case of first impression in this District.

## FINDINGS OF FACT

In early January, 1990, the Debtor made a telephone call to ITT's Roseville, Minnesota office to inquire about obtaining a loan. She had purchased a house on the East Side of St. Paul in August, 1989, with proceeds from the eminent domain condemnation of her previous home, and she needed funds to clear up legal and financial problems she had with it.[1] She also was thinking about buying furniture and/or appliances. She wanted to obtain a minimum of $1,000.00, so she could pay off at least the most pressing of the debts related to the house[2] and, possibly, buy some furniture.

The Debtor had obtained a small loan or loans from ITT some years before. She asked the ITT employee who answered the call whether she could get a loan secured by a mortgage against her house. The employee asked her whether she owned her house,

---

1. The problems were several: she still owed a portion of the purchase price and/or her closing costs, and the agent through whom the sale had been transacted was dunning her for payment; the fee title of her seller did not appear of record; title was clouded by a large federal-court judgment lien in favor of Barclay Square Properties, against a party prior to her in the chain of title; the City of St. Paul had disconnected water service as a result of a delinquent bill for prior service to the premises; and real estate taxes on the property were past due.

2. As she testified, these were the balance of the purchase price and whatever she had to pay to get the water service reconnected.

and whether there was any mortgage against it. After the Debtor answered these questions, the employee made an appointment for her.

As a result of these contacts,[3] ITT considered a credit application for the Debtor's benefit. An ITT employee named Paul Napoli completed this application in its entirety with information taken from the Debtor over the telephone, with information from a credit report for the Debtor, and with later telephone verifications on specific debt-entries from her past creditors. The Debtor never signed this application. In a box at the top of its first page that is entitled "Amount Applied For" is the figure "$3000.00," which is crossed out and replaced by the figure "$600.00" just below it. Under one of its final sections, entitled "Manager Analysis, Summary, Instruction for Closing," it has the handwritten notation "Sol H.E. OK."

As Marla Wiebolt, ITT's assistant manager, testified, this signified a decision by a Mr. Miller, ITT's branch manager, that Wiebolt should proceed to solicit the Debtor for a "home equity loan"—that is, a substantial loan secured by a mortgage against her house. Miller dated and signed the application as of January 23, 1990. The application recited that the Debtor had only one outstanding debt, other than the homestead-related debts she hoped to pay with the proceeds of the loan—a charge account with the J.C. Penney Company, with a balance of $368.00. The Debtor had not made a payment on this account for at least a year, but had not been dunned for payment on it. She had disclosed its existence in response to a question by Napoli.

During the course of an appointment on January 24, 1990, Wiebolt asked the Debtor whether she had the funds to pay for an appraisal of her homestead. The Debtor answered that she did not. She and Wiebolt also discussed the outstanding debt to the J.C. Penney Company. The Debtor never asked Wiebolt for a loan to enable her to pay off this debt.

After this discussion, Wiebolt proceeded to tape-record[4] a discussion that opened with Wiebolt's commitment to give the Debtor a check to pay off the J.C. Penney Company debt, "a check for the appraisal of $195," and a small check to the Debtor "for about $200." She then told the Debtor how ITT would amortize a loan to pay for these items; got the Debtor to agree to purchase credit life insurance for the transaction; and guided the Debtor through the completion of a personal financial statement on ITT's form. She then explained the completed numerical entries on a document entitled "Disclosure Statement, Note and Security Agreement,"[5] which the Debtor then signed.

This document recites the "Amount Financed" as $806.55. In a section entitled "Itemization of the Amount Financed," the document discloses the "Amount Financed" was to be disbursed in a manner described as follows:

| | |
|---|---|
| "Amount given to you [the Debtor] directly" | $232.43 |
| "CUSTOMER" | 195.00 |
| "CUST AND JC PENNEYS" | 368.00 |
| "Credit Life" | 11.12 |

The disbursement of $195.00 denominated as "CUSTOMER" was for the fee charged by a professional appraiser chosen by ITT to evaluate the Debtor's homestead. The disbursement denominated as "CUST AND JC PEN-

---

3. The record is not crystal-clear as to how many appointments the Debtor attended before she executed a first set of loan documents. The only preliminary documents in evidence that are actually signed by the Debtor are her first financial statement and a form entitled "Collateral List and Valuation." These, and the first set of executed loan documents, are both dated January 24, 1990. Thus, it seems, there was only one appointment, which encompassed all of these functions. Certain other preliminary documents are dated earlier—the "Credit Application" received into evidence as Exhibit I (not signed by the Debtor) and its accompanying worksheet.

These were prepared by ITT employees with information taken from the Debtor during her first telephone call.

4. The recording was with the Debtor's consent and, apparently, was done pursuant to ITT's prescribed practices. A transcription of the tape was received into evidence by stipulation as Plaintiff's Exhibit T.

5. This document was received into evidence by stipulation as Plaintiff's Exhibit A.

NEYS" was made to enable the Debtor to pay off this pre-existing debt. As Wiebolt testified, ITT induced the Debtor to agree to obtaining this component of the advance; the Debtor did not ask for it, and had never contemplated receiving it. Wiebolt testified that ITT did this pursuant to an internal policy, so the Debtor would not have other, past-due debts owing when the time came for her to begin payments to ITT. She also testified that ITT was "trying to improve [the Debtor's] creditworthiness" by doing so, but she admitted that ITT was not seeking to improve her creditworthiness just so she could obtain the small advance of funds on January 24, 1990.

The document goes on to recite the "Finance Charge" payable by the Debtor as $423.39, with the "Total of Payments" of $1,229.94 to be made over 36 months via a first installment of $39.94 and 35 others of $34.00 per month.

At the end of the tape-recorded closing, the Debtor expressed her wish to get a larger advance of funds. Wiebolt's response was "Yeah, yeah." When the Debtor left ITT's office, she took a check payable to her in the sum of $232.43, and one made payable jointly to her and the J.C. Penney Company for $368.00. She used the latter check to pay off her account with that creditor, and used the former check for household purposes—as she testified, "groceries, mostly."

After the Debtor left, Wiebolt retained an appraiser to evaluate the Debtor's house; she also ordered title insurance for the purposes of a mortgage against the house, in favor of ITT. Later the same day, a real estate appraiser came to the Debtor's house and conducted a brief physical inspection of it. After leaving a written copy of his conclusion as to value, the appraiser left. Though he never mentioned ITT during his visit, he was the professional that Wiebolt had retained.

Several weeks later, the Debtor called ITT to inquire about the mortgage-secured loan she had originally requested. After several subsequent telephone calls to Wiebolt, she made another appointment. When the Debtor appeared for the appointment on February 20, 1990, she and Wiebolt went through another colloquy that was tape-recorded.[6] They again went over the question of credit life insurance, and then reviewed the completed numerical entries on another "Disclosure Statement, Note, and Security Agreement," which the Debtor then executed.

This document stated the "Amount Financed" as $6,707.66. Under the section "Itemization of the Amount Financed," the document discloses that the loan proceeds were to be disbursed as follows:

| | |
|---|---|
| "Amount given to you directly" | $3,886.80 |
| "Amount paid on your account" | 817.15 |
| "Insurance Company: | |
| Title Insurance | 102.25 |
| Credit Life" | 155.07 |
| "Public Officials (filing/recording fees)" | 75.64 |
| "CUST AND DICK DELISLE" | 1483.00 |
| "CUST AND JAY MCNABB" | 160.00 |
| "JAY MCNABB" | 27.75 |
| "BAL OF ATTY FEE PAID BY ITT" | 7.25 |

Right below these entries, this section contains the notation:

"APPRAISAL FEE PD IN PREVIOUS LOAN"

Jay McNabb is an attorney. The two line-entries identified with his name represent disbursements from the advance made to the Debtor to compensate him for preparing a mortgage instrument ($27.75)[7] and an instrument to release the Debtor's house from the Barclay Square Properties judgment lien ($160.00).[8] ITT applied the sum designated as "Amount paid on your account" to dis-

---

6. The transcript of the tape was received into evidence by stipulation as Plaintiff's Exhibit U.

7. McNabb charged $35.00 to prepare the mortgage. As noted on the form, ITT disbursed $7.25 of its own funds to pay the balance of this fee.

8. The release was received into evidence by stipulation as Plaintiff's Exhibit E.

charge the Debtor's remaining obligation on the January 24, 1990 advance.

After this discussion, Wiebolt told the Debtor that "per the State of Minnesota, we are required to give you a three day right to cancel ..." She briefly discussed the nature of this right with the Debtor, who then executed, and received two copies of, an instrument entitled "Notice of Right to Cancel."[9] Though the Debtor was insistent about receiving the loan proceeds that day (apparently because her water service was still disconnected), Wiebolt refused to disburse them until three days had elapsed after the Debtor signed the Notice of Right to Cancel.

The Debtor also executed a mortgage instrument, granting ITT a real estate mortgage against her house to secure a debt recited as being in the sum of $6,707.66. The Debtor then left the ITT office, without receiving any of the funds identified in the second Disclosure Statement, Note and Security Agreement.

At or after this time, one of ITT's employees stamped the January 20, 1990 note "PAID BY RENEWAL," and then handwrote "2–20–90" under that notation.

On February 26, 1990, the Debtor returned to the ITT office and executed an acknowledgment on the back of the rescission notice, to the effect that she had not exercised her "right to cancel the transaction." ITT then released the funds to her.

When the Debtor had first called ITT she wanted only one loan transaction and disbursement. She did not change this expectation at any point during the sequence of transactions or after, and never made any request that she and ITT transact their business in the way Wiebolt structured it.

On June 11, 1991, the Debtor's counsel sent a letter to ITT's Roseville office. In it, he referred to the Debtor's "loan transaction with ITT Financial Services of February 20, 1990," and stated:

I have been authorized by Ms. Buckles to, and do so hereby, rescind that transaction pursuant to the Truth In Lending Act, 15 U.S.C. § 1635 and Regulation Z § 226.23.

. . . . .

The security interest held by ITT Financial Services in association with this loan is void upon this rescission. 15 U.S.C. § 1635; Regulation Z § 226.23. Pursuant to Regulation Z, you have twenty (20) days to return to Ms. Buckles all monies paid and to effectuate such actions as are necessary or appropriate to reflect termination of the security interest. Please also be advised that if you do not cancel the security interest and return all consideration paid by Ms. Buckles within this time period, you may be held responsible for all actual and statutory damages, attorney's fees and costs pursuant to 15 U.S.C. § 1640.

ITT received this letter on June 12, 1991.

On the same day, June 12, 1991, the Debtor filed a voluntary petition for relief under Chapter 7. She scheduled ITT as a secured creditor, noting the amount of its claim as $6,707.00, stating the security as "debtor's homestead," and describing the status of the debt as "lien & loan in dispute." She received a discharge in due course on October 1, 1991.

On June 27, 1991, ITT commenced this adversary proceeding by filing its complaint. By a mailing made on July 1, 1991, ITT served a motion for an order authorizing it to deposit into court a satisfaction of mortgage and a sum sufficient to satisfy any obligation to refund all past payments by the Debtor that it might have under the Truth In Lending Act consequent to a proper rescission by the Debtor. After a hearing on July 16, 1991, the Court entered an order that set deposit and tender requirements for ITT. ITT complied with those requirements; the satisfaction and the funds remain in deposit pursuant to the order.

When ITT's employee calculated the amount to be credited to pay off the January 20, 1990 transaction, he or she did so as if interest were to continue to accrue on the amount of the earlier advance through February 23, 1990, at the 29.45 percent annual

9. This document was received into evidence by stipulation as Exhibit D.

rate of interest rate under the first note. He or she used the same assumption to calculate the rebate of unearned credit insurance premiums for the earlier advance. This resulted in a charge made to the Debtor to satisfy the earlier note that was $3.31 more than if these components had been calculated through February 20, 1990.[10]

Had ITT structured the transaction to make all of the same disbursements via a single, mortgage-secured loan advance, the total amount financed for the Debtor's benefit would have been approximately $21.88 *less* than what was financed via the two advances actually made. At the 19 percent annual interest rate charged on the secured loan, the Debtor would have paid a total of $55.15 less had ITT structured the loan the way she had requested.[11]

Finally, assuming that the Debtor had to resume responsibility for the first advance according to its terms after a successful rescission of the second advance, she would continue to be held liable for two components of the first advance from which she would receive no value: the appraisal fee and the credit insurance. At the interest rate of the first note, that liability would total $317.47 over the three-year term of the first note.[12] This, essentially, would be the cost of exercising a right of rescission under the Truth in Lending Act that ITT's structuring of the transaction would impose on her.

## CONCLUSIONS OF LAW

Though ITT is the nominal plaintiff, this adversary proceeding stems entirely from the Debtor's attack on ITT's secured status as mortgagee. The Debtor invokes two sources of law for this attack, one federal and one state.

## I. TRUTH IN LENDING ACT

### A. The Basic Law

The federal Truth in Lending Act ("the TILA") was originally enacted in 1968. It is codified as Subchapter I of Chapter 41 of Title 15 of the United States Code, 15 U.S.C. §§ 1601–1667e. In a declaratory preamble, Congress stated:

> It is the purpose of this subchapter to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit . . .

15 U.S.C. § 1601(a).

▮ The TILA vests the Board of Governors of the Federal Reserve Board ("the FRB") with broad power to promulgate regulations to interpret and implement the Act. 15 U.S.C. § 1604(a). The Supreme Court upheld this delegation of authority in *Mourning v. Family Publications Serv.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). The FRB's regulations are set forth at 12 CFR Part 226, commonly known as "Regulation Z." In *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980), the Supreme Court held that the courts must grant great deference to Regulation Z, and to the "Official Staff Commentary" on the TILA and Regulation Z that the FRB's staff issues and revises from time to time.

The parties have stipulated that ITT is a "creditor" within the definition of 15 U.S.C. § 1602(f) and that the Debtor is a "debtor" under the protections of the TILA. For "closed-end" credit transactions such as those at bar, the TILA requires the creditor to disclose to the debtor certain enumerated factors going to the cost of the credit that the creditor is extending to the debtor. *See, in general,* 15 U.S.C. §§ 1631(a)–(b) and 1638(a). Those factors relevant to the matter at bar include the "amount financed," 15 U.S.C. § 1638(a)(2)(A); the "finance charge,"

---

**10.** These findings adopt the opinion of Kathleen E. Keest, the Debtor's expert witness, set forth in an affidavit received into evidence pursuant to stipulation as Plaintiff's Exhibit S. ITT did not offer any responsive evidence.

**11.** *See* n. 10 *supra.* Because the evidence going to this point is, again, unrebutted, it is not necessary to reprise the minutiae of Keest's calcula-

tions. As she noted, the data made available to her did not include a premium for credit insurance calculated on the lesser alternate loan amount, so it was not possible to calculate the difference to the penny.

**12.** *See,* nn. 10 and 11 *supra.*

15 U.S.C. § 1638(a)(3), as determined pursuant to 15 U.S.C. § 1605; the "finance charge expressed as an 'annual percentage rate,'" 15 U.S.C. § 1638(a)(4) (the latter as determined pursuant to 15 U.S.C. § 1606); the "sum of the amount finance and the finance charge, which shall be termed the 'total of payments,'" 15 U.S.C. § 1638(a)(5); the number and amount of payments scheduled to repay the total of payments, and their due dates or the period over which they are to be made, 15 U.S.C. § 1638(a)(6); an identification of the security, as purchase-money or nonpurchase-money, 15 U.S.C. § 1638(a)(9); and various other requirements not material to the matter at bar, 15 U.S.C. §§ 1638(a)(10)–(13). The creditor is also required to disclose the debtor's right to obtain a written itemization of the amount financed, and must provide that itemization if the debtor requests it. 15 U.S.C. § 1638(a)(2)(B).

The form of these disclosures is prescribed by Regulation Z at 12 CFR § 226.17(a) (1990):

> The creditor shall make the disclosures ... clearly and conspicuously *in writing*, in a form that the consumer may keep. The disclosures *shall be grouped together*, shall be segregated from everything else, and shall not contain any information not directly related to the disclosures required under [12 CFR] § 226.18 ...[13]

(emphasis added and footnotes deleted).

### B. Existence of Truth In Lending Violations

The gravamen of the Debtor's argument is that ITT violated Regulation Z's requirement that mandatory Truth in Lending disclosures be grouped together. The underlying thought is that ITT engaged in "loan-splitting": the Debtor wanted, requested, and expected to receive a single loan, consummated in one transaction, but ITT documented and made disclosure for the loan as if it were two separate transactions. As the Debtor would have it, the underlying transaction must be considered as a single one for the

purposes of the TILA.[14] ITT's act of spreading the disclosure over two different statements, she argues, violated the requirement of 12 CFR § 226.17(a), by the failure to group all of the disclosures for the single loan together in one writing. She also maintains that the two disclosures, if considered as applying to one aggregated transaction, materially misstate the actual cost of the underlying grant of credit, constituting an independent violation of the TILA.

For its part, ITT maintains that the February 26, 1990 transaction was distinct from the January 24, 1990 transaction, and that the latter transaction subsumed a "refinancing" of the earlier one. Under Regulation Z, "[r]efinancing is a new transaction requiring new disclosures to the consumer." 12 CFR § 226.20(a). Under ITT's argument, the mere act of making two disclosures would not raise the possibility of a violation of the TILA, so long as the discrete costs attributable to each of two successive extensions of credit are properly and separately set forth on a disclosure statement identified to each transaction.

The Official Staff Commentary to 12 CFR § 226.20(a)(1) opines:

> Whether a refinancing has occurred is determined by reference to whether the original obligation has been satisfied or extinguished and replaced by a new obligation based on the parties' contract and the applicable law.

■ The giving of two separate disclosure statements for a single loan transaction is a violation of the TILA's requirement of a single, comprehensible disclosure of the cost of credit. *Blair v. Nat'l Constr. Co. of the South, Inc.*, 611 F.2d 80, 83 (5th Cir.1980). *Blair* and the text of 12 CFR § 226.20(a)(1), then, suggest the threshold factual inquiry for the loan-splitting analysis: what was the parties' original agreement as to the nature, number, and purpose of the contemplated extension(s) of credit?

---

**13.** 12 CFR § 226.18 contains the regulations that further define the specific disclosure requirements of 15 U.S.C. § 1638.

**14.** The unspoken predicate is that the Debtor's pre-loan intention largely dictates the conclusion as to whether there was one extension of credit or two.

■ The circumstances surrounding the transactions in question will dictate the answer. *Hemauer v. ITT Financial Services,* 751 F.Supp. 1241, 1243–1244 (W.D.Ky.1990); *Adiel v. Chase Fed. Savings & Loan Assoc.,* 586 F.Supp. 866, 867 (S.D.Fla.1984). Specific factors relevant to the analysis include the following:

1. the debtor's purposes in applying for credit, and the needs he was seeking to meet by obtaining financing;

2. the debtor's expectation as to the number and sequence of financial commitments he would make in order to obtain the funds he sought to borrow;

3. the means, length, and clarity of the creditor's communications to the debtor about its proposals for loan terms;

4. the creditor's internal policies and controls for structuring extensions of credit, particularly with reference to initial "enabling" loans to finance the costs of application for a larger loan;

5. the extent to which the creditor's employee articulates such policies to the debtor as a justification for structuring a loan in a particular way;

6. the nature and results of any bargaining or negotiation on loan amount(s) and terms that went on between the parties.

The most important consideration will be the debtor's awareness and intent, both as they were before the creditor made its commitment and as they were when the debtor assented, tacitly or explicitly, to the way in which the creditor structured the loan. *Hemauer v. ITT Financial Services,* 751 F.Supp. at 1243–1244.[15]

■ All of the events, transactions, and other circumstances between mid-January and February 24, 1990 fully support one conclusion: ITT's two disbursements to the Debtor must be deemed to be one extension of credit for the purposes of Truth in Lending disclosure, which carried out a shared understanding as to the nature of that transaction. The evidence that virtually mandates this conclusions originates with both parties.

The Debtor never wanted or requested anything other than one loan, in an amount that would meet at least some of her pressing needs. Instead, ITT structured the initial disbursement so as to meet all of its own needs to process the loan the Debtor had requested; it did not give the Debtor a thing to meaningfully cope with her own needs. Most of the disbursements from that sham transaction were applied to purposes the Debtor had not even contemplated, but which gave ITT's personnel a rationalization under ITT's internal guidelines for the larger disbursement that she wanted. ITT could have processed her initial loan application for the full amount requested, contractually binding her to reimburse it for its appraisal costs were it to turn her down for the loan. It did not, instead erecting the artifice of an intermediate loan. However—and most tellingly—in a notation dated as of the initial disbursement, and made before the Debtor ever appeared in person at ITT's office, its district manager unequivocally expressed his readiness to consider the original request as made, via an active solicitation to the Debtor.

ITT protests that the separation in time between the two disbursements conclusively distinguishes this dispute from *Hemauer* and *Blair,* where the contractual instruments were executed and dated contemporaneously or much closer in time.[16] However, the record shows ITT's documented willingness to proceed immediately to receive the Debtor's application as originally made over the telephone, *prior to the first disbursement.* Many of the steps toward the approval of the

---

**15.** As its opening argument, the Plaintiff characterizes the loan-splitting theory of *Blair, Hemauer,* and *Adiel* as "a court created cause of action" that "exceeded [the] mandate under TILA and Regulation Z." This position is without merit. The practice of loan-splitting may be intentionally directed toward subverting the TILA, or toward less technical but still predatory goals, but the act of separating mandatory disclosures that accompanies it falls right within the ambit of the TILA's mandate that all disclosures be grouped together.

**16.** In *Blair,* the two alleged transactions were documented as of the same day. In *Hemauer,* the dates on the two instruments were one day apart, and a single disbursement to the borrowers' hands was made six days after the date of the later instrument.

Debtor's initial request were taken within several hours of each other, soon after Napoli completed the application: Miller's notation; the Debtor's visit to ITT's office; Wiebolt's order of title insurance; the in-home visit by ITT's appraiser; and the delivery of his written evaluation. This substantial contemporaneity gives the lie to ITT's argument.

Clearly, for whatever reason, Wiebolt was instructed to blandish the Debtor with a small cash advance and then to evade her inquiries regarding a larger disbursement until ITT finished its evaluation of her application. In both its initial (if clandestine) receptivity and in the final result, however, ITT treated this transaction in exactly the way that the Debtor had requested it: as a single one for a sum of money to meet the Debtor's legal and practical needs in re-establishing a home for herself.[17] She had requested the sum of $3,000.00; though some employee of ITT purported to change that request by crossing out the original notation in that amount on the loan application, neither the Debtor nor ITT's employees ever ceased to consider her ultimate request as being any less than the original amount.

*Hemauer* and this case, then, share the common and central characteristic of loan-splitting: the separation of charges for a single loan transaction into two or more disclosure statements.[18]

Notwithstanding the unity of the underlying transaction, ITT gave Truth in Lending disclosure as if it were two. It split off several components of the cost of extending the credit into two different documents. This was a *per se* violation of the requirement of 12 CFR § 226.17(a). As found *supra* at p. 759, the main violation also led to

an actual misstatement of the amount of that cost: the total finance charge for the transaction was $55.15 more than what it should have been for a loan of all of the same characteristics, had it been made via one set of disbursements pursuant to one disclosure statement. The second disclosure statement, then, overstated (and overassessed) the finance charge by an amount that exceeded the variance permissible under the TILA.[19]

ITT, then, was in violation of the TILA on February 24, 1990, when it made the large disbursement that the Debtor requested. Because it never gave the Debtor a corrected and consolidated disclosure statement, this violation continued until mid-June 1991.

### C. Statute of Limitations

■ In the prayer for relief in her answer and counterclaim, the Debtor requested two different remedies: an award of statutory damages for each of ITT's Truth in Lending violations pursuant to 15 U.S.C. § 1640(a)(2); and declaratory relief to the effect that she had properly rescinded her loan transaction with ITT pursuant to 15 U.S.C. § 1635(a) and that ITT's mortgage against her house had become void by operation of 15 U.S.C. § 1635(b) as a result. In his pre-trial brief, ITT's counsel argued that the Debtor's claim for statutory damages was now time-barred by the statute of limitations in 15 U.S.C. § 1640(e):

> **Jurisdiction of courts.** Any action under [15 U.S.C. § 1640] may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation.

17. Citing various precepts of the state law of contract formation, ITT's counsel maintains that his client rejected an initial offer from Buckles and that she then acquiesced to its counter-offer of a transaction with very different terms. As the Debtor's counsel points out, however, this use of a common-law analysis is inapposite. The source of the governing law here is a federal statute, which responds to a unique legislative concern over promoting the fully-informed use of credit and preventing predatory lending practices on the part of creditors. As construed by courts like those in *Hemauer* and *Blair*, this very different focus should control the treatment of the facts.

18. In *Hemauer*, the line-entry split off from the "main" disclosure statement was a service fee in the nature of a finder's fee, paid to a mortgage broker. 751 F.Supp. at 1243.

19. To comply with the TILA, the amount disclosed as the finance charge must not be more than $10.00 above or below the exact figure as mathematically determined. 12 CFR § 226.18(d), n. 41; *FRB Official Staff Interpretations of Regulation Z*, § 226.18(d).2.

As the Eighth Circuit has held, the one-year period for bringing actions for damages under TILA under this provision commences with the consummation of the underlying loan transaction—the date on which the parties' contract is formed and credit is extended pursuant to it. *Dryden v. Lou Budke's Arrow Finance Co.*, 630 F.2d 641, 646 (8th Cir.1980). Any action not brought within that period is time-barred. *Munson v. Orrin E. Thompson Homes, Inc.*, 395 F.Supp. 152, 159 (D.Minn.1974).[20] The Debtor's counsel did not challenge this position in oral argument, pre-trial brief, or post-trial memorandum, and has not asserted a right to statutory damages since he filed his client's answer and counterclaim. Under the simple language of the statute and the cited authorities, the Debtor's request for damages is time-barred.

■ The Debtor's request for declaratory and equitable relief on her asserted right to rescission is not time-barred, however. Under 15 U.S.C. § 1635(f), and subject to an exception not applicable to the dispute at bar,

> [a]n obligor's right of rescission shall expire three years after the date of consummation of the [loan] transaction or upon the sale of the [subject] encumbered property, whichever occurs first, notwithstanding the fact that the information and forms required under [15 U.S.C. § 1635] or any other disclosures required under [15 U.S.C. c. 41, subc. I, pt. B] have not been delivered to the obligor ...

Thus, in a case where a borrower has not received TILA-mandated disclosure, he retains the right of rescission under 15 U.S.C. § 1635(a) for a period of three years after the date of the loan. *Aquino v. Public Fin. Consumer Discount Co.*, 606 F.Supp. 504, 511 (E.D.Pa.1985). Any lawsuit brought to vindicate that right is not time-barred so long as it is filed before three years have run from the consummation of the loan. *Dough-*

*erty v. Hoolihan, Neils, and Boland, Ltd.*, 531 F.Supp. 717, 721 (D.Minn.1982). *See also Rudisell v. Fifth Third Bank*, 622 F.2d at 247–248 n. 5; *Rowland v. Magna Millikin Bank of Decatur, N.A.*, 812 F.Supp. at 878–880. The Debtor, then, is not time-barred from asserting her remedy of rescission via this adversary proceeding.

**D. Remedy: Conditional or Otherwise**

■ Because ITT did not make proper Truth in Lending disclosure to the Debtor, she had the benefit of a full three-year period to rescind her loan transaction. She timely made a demand for rescission on ITT. The consequence of that demand, particularly in light of her status as a discharged debtor in bankruptcy, is the next issue.

15 U.S.C. § 1635(a) gives a right of rescission to the obligor in a consumer credit transaction in which the security is the principal dwelling of the person to whom credit was extended. Under 15 U.S.C. § 1635(b),

> [w]hen an obligor exercises his right to rescind under [15 U.S.C. § 1635](a) ..., he is not liable for any finance or other charge, and any security interest given by the obligor ... becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under [15 U.S.C. § 1635(b) ], the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value.... The procedures

---

20. Many other courts have adopted this rule. *E.g., Rudisell v. Fifth Third Bank*, 622 F.2d 243, 246 (6th Cir.1980); *Rust v. Quality Car Corral, Inc.*, 614 F.2d 1118, 1119 (6th Cir.1980); *Bartholomew v. Northampton Nat'l Bank of Easton*, 584 F.2d 1288, 1296–1297 (3d Cir.1978); *Basham v. Finance America Corp.*, 583 F.2d 918, 927–928 (7th Cir.1978), *cert. den.*, 439 U.S. 1128, 99 S.Ct. 1046, 59 L.Ed.2d 89 (1979), *cert. den.*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); *Rowland v. Magna Millikin Bank of Decatur, N.A.*, 812 F.Supp. 875, 881–882 (C.D.Ill.1992); *Steib v. St. James Bank & Trust Co.*, 642 F.Supp. 910, 912 (E.D.La.1986); *Chevalier v. Baird Saving Ass'n*, 371 F.Supp. 1282, 1284 (E.D.Pa.1974).

prescribed in this subsection shall apply except when otherwise ordered by a court.

The regulations promulgated for these provisions are set forth at 12 CFR § 226.23(d):

(d) *Effects of rescission.* (1) When a consumer rescinds a transaction, the security interest giving rise to the right of rescission becomes void and the consumer shall not be liable for any amount, including any finance charge.

(2) Within 20 calendar days after receipt of a notice of rescission, the creditor shall return any money or property that has been given to anyone in connection with the transaction and shall take any action necessary to reflect the termination of the security interest.

(3) If the creditor has delivered any money or property, the consumer may retain possession until the creditor has met its obligation under [12 CFR § 226.23](d)(2).... When the creditor has complied with that paragraph, the consumer shall tender the money or property to the creditor or, where the latter would be impracticable or inequitable, tender its reasonable value. At the consumer's option, tender of property may be made at the location of the property or at the consumer's residence. Tender of money must be made at the creditor's designated place of business. If the creditor does not take possession of the money or property within 20 calendar days after the consumer's tender, the consumer may keep it without further obligation.

(4) The procedures outlined in paragraphs (d)(2) and (3) of this section may be modified by court order.[21]

■ As several courts have noted, the first impression created by the statute does not quite comport with the traditional notion of the remedy of rescission. Rescission of a contract, of course, is to result in the return of both parties to the *status quo ante:* each side is to be restored to the property and legal attributes that it enjoyed before the contract was entered and performed. *F.D.I.C. v. Hughes Dev. Co., Inc.,* 684 F.Supp. 616, 622 (D.Minn.1988) (citing *James v. Home Constr. Co. of Mobile, Inc.,* 621 F.2d 727, 730 (5th Cir.1980)); *Dougherty v. Hoolihan, Neils, and Boland, Ltd.,* 531 F.Supp. at 721. The quoted language from 15 U.S.C. § 1635(b), however, could be construed as imposing an absolute duty on the creditor to satisfy its security interest of record and to refund all payments previously made by the obligor, once it receives a notice of rescission from the obligor, and requiring the creditor to await the obligor's good graces and/or good faith for performance of its reciprocal duties in rescission after that.

Courts have had to apply this language to cases where the rescinding obligor's ability to perform was doubtful. Most of them have held, in essence, that the statutory language does not override the traditional attributes of rescission. *E.g., Palmer v. Wilson,* 502 F.2d 860, 862 (9th Cir.1974); *Aquino v. Public Fin. Consumer Discount Co.,* 606 F.Supp. at 509. Thus, at least in cases where the rescinding obligor might lack the current ability to return the principal amount of the original loan, these courts have conditioned the creditor's duty to satisfy its lien of record on the obligor's prior tender of the original principal amount of the loan. *See e.g., Brown v. Nat'l Permanent Fed. Sav. & Loan Ass'n,* 683 F.2d 444, 449 (D.C.Cir.1982); *Rudisell v. Fifth Third Bank,* 622 F.2d at 254; *Powers v. Sims & Levin,* 542 F.2d 1216, 1220–1222 (4th Cir.1976); *LaGrone v. Johnson,* 534 F.2d 1360, 1361–1362 (9th Cir.1976); *Palmer v. Wilson,* 502 F.2d at 862; *Rowland v. Magna Millikin Bank of Decatur, N.A.,* 812 F.Supp. at 881. The District Court for this District has ruled this way. *FDIC v. Hughes Dev. Co., Inc.,* 684 F.Supp. at 616.

Other courts—including the few Bankruptcy Courts that have addressed this issue—have disagreed. *In re Celona,* 90 B.R. 104, 114–115 (Bankr.E.D.Pa.1988); *In re Piercy,*

---

**21.** The regulations' references to the delivery of *"any money or* property" to the obligor clear up a potential ambiguity created by the third and fourth sentences of 15 U.S.C. § 1635(b). Had the regulation not expressly noted that "money" was among the "property" subject to the rescinding obligor's reciprocal tender obligation, the statute could have been read as applying only to credit sales of goods—or, at the very least, the full nature of the rescinding obligor's duties would have been left ambiguous.

18 B.R. 1004, 1007–1008 (Bankr.W.D.Ky. 1982); *In re Pitre,* 11 B.R. 777, 780 (Bankr. N.D.Ill.1981). These courts' reasoning, however, is deficient on at least three grounds— two of them sounding under more general principles, and the third specific to the bankruptcy context.

■ First, by relying solely on the verbiage of 15 U.S.C. § 1635(b) in isolation, these courts ignore the fact that the underlying remedy is, after all, an equitable one. Equity overrides the result that would come from the strict application of legal principles. In the interests of fundamental fairness, it is applied to maintain a balance of rights and duties between the affected parties. When called upon to dispense a remedy whose purpose is to restore a *status quo ante,* a court should ensure that it does just that. To do otherwise would upset the balance that equity is to maintain.

Second, a rote application of the verbiage of 15 U.S.C. § 1635(b) in isolation ignores the broader structure of benefits, burdens, and remedies under the TILA. By establishing a "cooling-off period" for loans that would be secured by residential mortgages, Congress intended to promote a more thoughtful review of the costs of credit by prospective borrowers, in the situation where the attachment of a lender's lien could materially affect their financial ability to maintain a homestead. By prohibiting the disbursement of loan proceeds until the end of the three-day period, 12 CFR § 226.23(c) protects both sides' interests in ensuring a post-rescission return to the *status quo ante.*

These provisions do not immediately speak to the situation at bar, of course, because ITT did not give adequate disclosure when it originally extended credit to the Debtor. That failure, of course, activated the extension under 15 U.S.C. § 1635(f). Clearly, by exposing credit transactions to the possibility of rescission for a much longer time, this provision gives a great incentive to make timely adequate disclosure. The extended rescission period further protects borrowers, by giving them an ample opportunity to discover deficient disclosure. However, there is nothing in the statute reflecting a legislative intent to have an end-result any different from that in the case of timely adequate disclosure: a return to the *status quo ante.*

■ In both instances, the remedy of rescission serves an equitable function. It does not serve a punitive one. Congress established punitive remedies in the TILA, in the form of statutory damages assessed in multiples of the charged finance charge. *Cf. F.D.I.C. v. Hughes Dev. Co., Inc.,* 684 F.Supp. at 622 (holding that statutory damages under TILA are "civil penalty" that may not be awarded against governmental agency like Federal Deposit Insurance Corporation). Subject to the possible limitations of substantive due process, Congress could have created a punitive remedy to affect the final, binding nature of the underlying secured loan. It did not. By its very nature, rescission under the TILA voids out the offending transaction. Unlike the imposition of statutory damages and awards of attorney fees and costs under TILA, however, it goes no further than that. Not being in the nature of a penalty, *F.D.I.C. v. Hughes Dev. Co., Inc.,* 684 F.Supp. at 622–623, the remedy of rescission should not be judicially administered in any way that would make it one.

■ The third deficiency appears in those decisions that apply Truth in Lending rescission in the context of a bankruptcy case. With varying degrees of precision, all of these cases proceed from an assumption that a grant of discharge in bankruptcy somehow makes it wrong to compel a discharged debtor to carry out his duty as a rescinding obligor under the TILA. *See In re Pitre,* 11 B.R. at 780 (cryptically stating, as to debtor's duty under 15 U.S.C. § 1635(b) to return money or property, "neither of which *can be* accomplished by the Debtor *under the circumstances of this bankruptcy* ..." (emphasis added)); *In re Piercy,* 18 B.R. at 1007 (holding that "[c]onditioning rescission upon the debtor's payment.... imposes an obligation from which the debtor has been legally freed ... there is a legitimate, legal impediment to the debtor's reciprocal performance ...."); *In re Celona,* 90 B.R. at 114–115 (relying on *Piercy's* reasoning to permit discharged debtors to rescind under TILA without tendering principal bal-

ance of loan, apparently on conclusion that to do otherwise would be " 'negating the fresh start given the debtors upon their discharge ...' ").

 These courts, however, have confused their equities, and confounded their competing equitable remedies. Discharge in bankruptcy does indeed

> ... operate as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover, or offset any ... debt [subject to such discharge] as a personal liability of the debtor, whether or not discharge of such debt is waived ...

11 U.S.C. § 524(a)(2). By its terms, however, this statute prohibits positive action *by a creditor* to collect a discharged debt. The *Pitre, Piercy,* and *Celona* courts ignore the fact that the parties seeking the affirmative before them were not creditors, but discharged debtors. By insisting on keeping the statutorily-protected value of their security, the creditors in these cases were not taking positive action in violation of the discharge injunction. Rather, they were only relying on a precept that has been a fundament of American bankruptcy law for over a century: properly-perfected liens against a debtor's assets survive a bankruptcy filing and remain fully enforceable after a grant of discharge, absent consensual satisfaction or avoidance via a remedy expressly created in bankruptcy or nonbankruptcy law.[22] *See, e.g., Dewsnup v. Timm,* 502 U.S. 410, 416–420, 112 S.Ct. 773, 777–79, 116 L.Ed.2d 903 (1992); *Johnson v. Home State Bank,* 501 U.S. 78, 83–85, 111 S.Ct. 2150, 2153–54, 115 L.Ed.2d 66 (1991); *Farrey v. Sanderfoot,* 500 U.S. 291, 296–298, 111 S.Ct. 1825, 1828–29, 114 L.Ed.2d 337 (1991); *Long v. Bullard,* 117

U.S. 617, 620–621, 6 S.Ct. 917, 918, 29 L.Ed. 1004 (1886). They had a long-recognized right to be compensated for relinquishing their secured rights. More to the point, the debtors—*and not the creditors*—were the proactive parties; they came forward voluntarily to undo a pre-petition transaction from which their creditors would have retained value in a fashion that was protected from the bankruptcy process. By invoking rescission under the TILA, a debtor necessarily has to take all of the burdens of the remedy with its benefits. By the simple fact of his voluntary act in doing so, the debtor renders his reciprocal duty of tender into a voluntary payment that is entirely permitted under the Bankruptcy Code. 11 U.S.C. § 524(f).[23]

Given the major defects in the reasoning of *Pitre, Piercy,* and *Celona,* the Debtor was ill-put to rely on them as authority for her insistence that she, as a discharged debtor in bankruptcy, has no duty to return the principal balance of her loan from ITT.

In short, then: the equities of this case—and, in particular, the Debtor's straitened financial circumstances—are such that her receipt of the benefits of rescission under the TILA should be conditioned on her tender of her duty of repayment under the statute. She has no protection from the dictates of that duty merely because she has been discharged from legal liability on the original debt. *Accord, Rowland v. Magna Millikin Bank of Decatur, N.A.,* 812 F.Supp. at 881.[24]

 As the District Court noted in *F.D.I.C. v. Hughes Dev. Co., Inc.,* a court altering the procedure for rescission under 15 U.S.C. § 1635(b) should set a deadline for the rescinding obligor's tender, to assure some finality in the process. Given the smaller principal amount of the loan and the

---

**22.** The phraseology here is from *In re Scheierl,* 176 B.R. 498, 507 n. 22 (Bankr.D.Minn.1995).

**23.** This statute reads:
> Nothing contained in [11 U.S.C. §§ 524](c) or (d) ... prevents a debtor from voluntarily repaying any debt.

(Sections 524(c)–(d) govern the formal reaffirmation of debts otherwise subject to discharge in bankruptcy.) This provision was enacted as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984). However, as the commentators

have observed, it did not enact new law; it only stated the obvious, a principle springing from the simplest of common-sense extrapolations from previous law. 3 COLLIER ON BANKR. ¶ 524.06, at 524–48 (15th ed. 1995). *See also In re Avis,* 3 B.R. 205, 207 (Bankr.S.D.Ohio 1980).

**24.** This conclusion moots out ITT's argument that the Debtor's duty to tender in rescission arose as a matter of law after her bankruptcy filing and, thus, was not affected by her discharge.

application of offset against the amounts previously tendered into escrow by ITT,[25] it is appropriate to fix ninety days as a period for the Debtor to make her tender.

## II. MINNESOTA REGULATED LOAN ACT

The Debtor also seeks an award of statutory damages from ITT under a state-law theory sounding under the Minnesota Regulated Loan Act, MINN.STAT. §§ 56.001–56.26. The parties have stipulated that ITT is bound by the regulatory provisions of the Regulated Loan Act, as to the two disbursements in question here.

The Debtor bases her claim on the following provision of MINN.STAT. § 56.131 subd. 2:

**Additional charges.** In addition to the charges provided for by [MINN.STAT. §§ 56.131] and 56.155, no further or other amount whatsoever, shall be directly or indirectly charged, contracted for, or received for the loan made, except actual out of pocket expenses of the licensee to realize on a security after default, and except for the following additional charges which may be included in the principal amount of the loan:

(a) lawful fees and taxes paid to any public officer to record, file, or release security;

(b) with respect to a loan secured by an interest in real estate, the following closing costs, if they are bona fide, reasonable in amount, and not for the purpose of circumvention or evasion of this section; provided the costs do not exceed one percent of the principal amount or $250, whichever is greater:

(1) fees or premiums for title examination, abstract of title, title insurance, surveys, or similar purposes;

(2) fees, if not paid to the licensee, an employee of the licensee, or a person related to the licensee, for prepara-

tion of a mortgage, settlement statement, or other documents, fees for notarizing mortgages and other documents, and appraisal fees;

(c) the premium for insurance in lieu of perfecting and releasing a security interest to the extent that the premium does not exceed the fees described in [MINN.STAT. § 56.131 subd. 2](a) . . .

This provision sets a cap on the charges for "closing costs" that a lender may charge or include in the principal amount of a regulated loan. Though MINN.STAT. § 56.131 subd. 2(b) fixes that cap at $250.00, MINN. STAT. § 56.131 subd. 4 provides for the adjustment of this dollar-amount, to track general inflation or deflation in the United States economy. The parties have stipulated that the adjusted amount applicable to the transaction at bar is $325.00.

As the Debtor's counsel points out, the total of the line-entries for the appraisal fee, title insurance, and the portion of the attorney fees for the preparation of the mortgage instrument that ITT charged to the Debtor [26] is exactly $325.00. The Debtor, however, takes issue with the further charge of $160.00 assessed against her for the fees charged by attorney McNabb- to prepare a release to cure the cloud on title caused by the Barclay Square Properties judgment lien. She points out that it clearly does not qualify as a public filing fee under MINN.STAT. § 56.131 subd. 2(a), and maintains that by its very nature it cannot classify as a charge in relation to title evaluation under MINN.STAT. § 56.131 subd. 2(b)(1), an appraisal fee under MINN.STAT. § 56.131 subd. 2(b)(2), or a fee for documenting the mortgage or the loan transaction itself under MINN.STAT. § 56.131 subd. 2(b)(2).

In response, ITT argues, rather summarily, that the charge in question did not fall within the statute's "definition" of closing costs, and was not subject to the cap.

---

**25.** Via the statements of its counsel in brief and argument, ITT did not just acquiesce to such an offset; it had come forward to suggest it. There is authority in the caselaw for such an adjustment. *E.g., F.D.I.C. v. Hughes Dev. Co., Inc.,* 684 F.Supp. at 626 (allowing rescinding obligor to take credit against tender obligation for amount of interest-only payments made on loan; also allowing creditor to insist on repayment of real estate taxes it had advanced for property, as part of obligor's duty to tender).

**26.** *See* n. 7, p. 757 *supra.*

■ There does not seem to be a single reported case construing the scope of MINN.STAT. § 56.131 subd. 2(b). Nor is there any published legislative history for it. The purpose of the legislation, however, can be gleaned from its subject matter and substantive provisions. *E.g., Hennepin County v. City of Hopkins*, 239 Minn. 357, 58 N.W.2d 851, 854 (1953) (in interpreting statute, its subject matter as a whole, among other things, may be considered to determine intent of legislature). To determine its meaning, a provision in question must be considered in the context of the entire statute, with particular reference to related provisions. *E.g., Kachman v. Blosberg*, 251 Minn. 224, 87 N.W.2d 687, 692 (1958); *Kollodge v. F. and L. Appliances, Inc.*, 248 Minn. 357, 80 N.W.2d 62, 65–65 (1956).

■ MINN.STAT. § 56.131 subd. 2 is clearly a consumer-protection measure; it regulates the cost of credit by prohibiting certain lenders from assessing their borrowers anything by way of "closing costs" other than those specified in the statute, and limits the total charge they can make for the specified costs. The expenses described with specificity in the statute all are of the sort incurred in documenting and perfecting a lender's secured rights, in the form of a mortgage against real estate. They all directly benefit the lender, by insuring the primacy of its lien; their benefit to the borrower is indirect at best, and only in the sense of facilitating the lender's willingness to extend credit to the borrower. As the Debtor would have it, the attorney fees in question either do not qualify as such costs—in which case they fall under the general prohibition of the prefatory language of subd. 2—or, to the extent that they somehow do qualify under subd. 2(b)(1)–(2), ITT exceeded the $325.00 maximum charge.[27]

As a technical matter, this argument is rather clever. However, in framing his reference to the statute, counsel elides the fact that, in seeking a loan from ITT in the first place, the Debtor wanted to obtain the wherewithal to clear the title to her house.

She had taken a conveyance from a grantor whose title was seriously clouded by several different defects, and she had never made her grantor clear the title before she took the conveyance. The clouds, then, were very much her problem. She lacked the funds to do anything about them.

Had the instrument in question been a subordination of the judgment lien to ITT's mortgage, rather than an outright satisfaction, the theory would have made more sense in light of the nature of the statutory classification. Of course, it served ITT's interests as prospective mortgagee to have a senior encumbrance lifted from the property. Had this cloud emerged only during the course of a pre-loan title examination, ITT undoubtedly would have required the release, or at least a subordination, as a condition of closing the loan. However, the Debtor had already resolved to clear her own title, and this was one of several reasons why she wanted to obtain the loan. In issuing a check made payable jointly to her and Jay McNabb, then, ITT was not assessing a further closing cost against her. Just as it did when it issued a check jointly to her and her grantor to cover the balance of her purchase price, it was meeting one of her expressed needs for seeking the loan. The fact that ITT's interests as a prospective mortgagee coincided with hers does not change the nature of the disbursement. That was fixed by her original purpose in seeking the loan.

This line-entry, then does not factor into the closing costs that are regulated and capped by MINN.STAT. § 56.131 subd. 2(b). The Debtor does not have a claim for damages against ITT under the Minnesota Regulated Loan Act.

### ORDER FOR JUDGMENT

Upon the foregoing Findings of Fact and Conclusions of Law, then,

IT IS HEREBY ORDERED, ADJUDGED, AND DECREED:

1. In connection with the extension of credit made by the Plaintiff to the Defendant

---

27. The Debtor does not maintain that ITT violated the statute in charging any of the other line-entries as closing costs.

on February 20, 1990, the Plaintiff failed to make a disclosure to the Defendant that was proper under 15 U.S.C. §§ 1631(a)–(b) and 1638(a), and 12 CFR § 226.17(a).

2. Accordingly, the Defendant continued to have the right to rescind her loan transaction with the Plaintiff as of June 11, 1991.

■■■ 3. The Plaintiff's tender of an executed satisfaction of mortgage and its payment of certain sums into escrow pursuant to the order entered herein on July 23, 1991, if timely made pursuant to that order, satisfied the Plaintiff's duty of tender under 15 U.S.C. § 1635(b), pending entry of the present Order and Judgment.

4. The release of the satisfaction of the Plaintiff's mortgage from escrow shall be conditioned upon the Defendant's prior tender to the Plaintiff of the sum of $6,707.66, less the amounts currently held in escrow pursuant to the order entered herein on July 23, 1991. Any such tender by the Defendant shall be made in certified funds, at the office of the Plaintiff's counsel of record for this adversary proceeding.

5. If the Defendant has not tendered the sum contemplated by Term 4 of this Order and Judgment to the Plaintiff by March 1, 1996, the Defendant's rescission of her loan transaction with the Plaintiff will not be binding on the Plaintiff. In such case, the executed satisfaction of mortgage and sums previously tendered by the Plaintiff into escrow shall be released back to the Plaintiff and the rights and liabilities of the parties in connection with the extension of credit on February 20, 1990, shall be governed by applicable law other than the Truth–In–Lending Act, 15 U.S.C. §§ 1601, *et seq.*

6. The Plaintiff did not violate the Minnesota Regulated Loan Act, Minn.Stat. §§ 56.001–56.26, in connection with its extension of credit to the Defendant on February 20, 1990.

LET JUDGMENT BE ENTERED ACCORDINGLY.