In re Bradley R. THAYER and Judith N. Thayer, Debtors.

American Residential Mortgage, LP, Plaintiff,

v.

Bradley R. Thayer and Judith N. Thayer, Defendants.

Bankruptcy No. 04–32735.
Adversary No. 04–3338.

United States Bankruptcy Court, D. Minnesota.

Feb. 1, 2007.

7. Federal Rule of Bankruptcy Procedure 7013 is mirrored by Arkansas Rule of Civil Procedure 13.

Karl A. Oliver, The Oliver Group, PLC, Roseville, MN, for Debtors/Defendants.

Heather B. Thayer, Fredrikson & Byron, James R. Mayer, Fredrickson Byron, PA, Minneapolis, MN, for Plaintiff.

## ORDER RE: CROSS–MOTIONS FOR SUMMARY JUDGMENT

GREGORY F. KISHEL, Chief Judge.

This adversary proceeding came on before the Court for hearing on the parties' cross-motions for summary judgment. The Plaintiff ("American Residential") appeared by its attorney, Heather B. Thayer, Fredrikson & Byron, P.A. The Defendants ("the Debtors") appeared by their attorney, Karl A. Oliver, The Oliver Group, PLC. Upon the motions, their supporting documentation, and the arguments of counsel, the following order is made.

### THE PARTIES

The Debtors, Bradley R. Thayer and Judith N. Thayer, filed a voluntary petition for bankruptcy relief under Chapter 7 on May 5, 2004. Their bankruptcy case is still pending.

The Debtors noted American Residential as a creditor for their bankruptcy filing, on Schedule F, "Creditors Holding Unsecured Nonpriority Claims." American Residential is a Minnesota limited partnership. It maintains its principal place of business at Maplewood, Minnesota.

At least for the purposes of this adversary proceeding, the parties' joint history began on September 11, 2002. On that date, they assumed the legal relationship of debtors and creditor, mortgagors and mortgagee, in a transaction that included the grant of a mortgage against the Debtors' residence. In August, 2003, the Debtors applied to refinance this obligation through American Residential; then, they took steps toward a rescission of the trans-

action pursuant to the Truth In Lending Act, 15 U.S. § 1601, *et seq.* ("TILA").

## NATURE OF THIS ADVERSARY PROCEEDING

After the Debtors' bankruptcy filing, American Residential asserted the status of a secured creditor holding a perfected and enforceable mortgage against the Debtors' residence. The Debtors opposed that; they maintained that American Residential's mortgage had been released before their bankruptcy filing and that any *in personam* liability they had to American Residential on any debt, underlying that mortgage or otherwise, was subject to discharge in their bankruptcy case.

American Residential timely commenced this adversary proceeding to resolve this dispute.

In Count I of its complaint, American Residential seeks a judicial declaration that it currently holds all of the rights as creditor and mortgagee under the original September, 2002 transaction between the parties, and as such it has a valid and enforceable mortgage against the Debtors' residence.

Count II of American Residential's complaint goes to a contractually-distinct debt obligation, that of Debtor Bradley Thayer alone, to the extent that such was created in August, 2003 through the aborted refinancing. Via Count II, American Residential seeks a judgment that this debt is excepted from discharge in the underlying Chapter 7 case, by operation of 11 U.S.C. § 523(a)(2)(B).

It is not immediately clear from the face of the complaint whether American Residential pleaded for these two forms of relief in the alternative.

In their answer, the Debtors deny in sum that American Residential is entitled to either form of relief. As both affirmative defense and counterclaim, the Debtors' counsel pleaded a raft of legal theories, under various consumer protection statutes and aspects of common law and equity. In the main, however, the Debtors asserted that American Residential failed to honor their right under TILA to rescind the August, 2003 refinancing transaction. With equal strength, they pled that an instrument executed in connection with the refinancing that purported to satisfy the mortgage granted to American Residential in September, 2002 is a valid memorialization of a full release of the mortgage, is binding on American Residential, and under Minnesota law must now be recorded.[1]

## MOTIONS AT BAR

Both sides have moved for summary judgment on Count I of the Plaintiff's complaint. In addition, the Debtors have moved for summary judgment on Count II. The governing rule is Fed. R. Bankr.P. 7056.[2] Under it, the predicate for a grant

---

1. The Debtors' answer contains certain other counterclaims and requests for relief that were previously dismissed on American Residential's motion, for want of standing on the Debtors' part. (The Debtors had not been allowed an exemption for causes of action under TILA, and the trustee of their bankruptcy estate had proceeded to administer the causes of action.) The Bankruptcy Appellate Panel for the Eighth Circuit declined to exercise jurisdiction over the Debtors' appeal from that order, holding that it was interlocutory in nature. *In re Thayer*, No. 04–6068MN (B.A.P. 8th Cir. November 24, 2004).

2. This rule makes Fed.R.Civ.P. 56 applicable to adversary proceedings in bankruptcy. In pertinent part, Fed.R.Civ.P. 56(c) provides that, upon a motion for summary judgment,

   [t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits [submitted in support of the motion], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

of judicial relief "as a matter of law" is a record that establishes as uncontroverted all facts that are outcome-determinative under the governing law. *In re Nation–Wide Exch. Servs., Inc.,* 291 B.R. 131, 137–139 (Bankr.D.Minn.2003), and appellate authority cited therein; *In re Jolly's, Inc.,* 188 B.R. 832, 837–838 (Bankr.D.Minn. 1995).[3] When all material facts are thus identified and fixed, the court applies the law, and parses out the results as the principles of that law dictate. *In re Jolly's, Inc.,* 188 B.R. at 838.

In form, the task at bar is one often encountered in the context of bankruptcy—determining the legal character and consequence of a sequence of transactions between the parties, with the transactions fully evidenced by documents that can readily be put into a court record. Where the governing law does not implicate such subjective factors as intent or other states of mind, and a stipulated or undisputed documentary record readily reflects the nature and sequence of the transactions, such disputes are well-resolved by motions for summary judgment. *In re Nation–Wide Exch. Servs., Inc.,* 291 B.R. at 139. Counsel for the parties at bar never got together on a stipulation of facts; nor did they make any agreement as to the authenticity of documents. However, each side has farmed various exhibits into the record without opposition from the other. In toto, those documents enable fact-finding broad enough to allow a disposition on all of the issues under common law and statute that are implicated by Count I and the Debtors' responsive pleading. Thus, that part of this adversary proceeding is ripe for summary judgment. The established facts are as follows.

## UNCONTROVERTED FACTS

1. On September 11, 2002, the Debtors executed a promissory note in favor of American Residential in the original principal amount of $157,700.00, and a mortgage instrument in favor of American Residential to secure the underlying debt via the grant of a mortgage against the Debtors' residence in Cottage Grove, Washington County, Minnesota. Shortly after that, American Residential assigned its interests under the note and mortgage to TCF Mortgage Corporation ("TCF").[4]

2. In August, 2003, the Debtors "decided to refinance the TCF mortgage."[5] In consequence of that decision, the Debtors proceeded to "refinance the mortgage" via a new transaction with American Residential.

3. On August 25, 2003, Debtor Bradley R. Thayer signed a promissory note in favor of American Residential, in the principal amount of $170,000.00. Both Debtors executed a mortgage instrument in favor of American Residential to grant a mortgage against their residence to secure the debt evidenced by this note.[6]

4. The Debtors' intentions were to use a portion of the proceeds of this loan to pay off the debt under the TCF note. The transactional arrangements for closing on the refinancing were planned accordingly.

3. This definition of materiality has been judicially-construed under Rule 56. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Hammer v. City of Osage Beach,* 318 F.3d 832, 837 (8th Cir.2003).

4. As the parties did in their submissions, these initial instruments will be termed "the TCF note" and "the TCF mortgage."

5. The phrasing here is that of Judith N. Thayer, per the affidavit she submitted for the motions at bar.

6. These instruments will be termed "the American Residential note" and "the American Residential mortgage."

5. On August 25, 2003, the date of the closing, American Residential turned over the funds for the closing to River Town Title, Inc., the closing agent, as required by Minn.Stat. § 82.49. Under standard practice in the mortgage loan industry, River Town Title was then to make all disbursements pursuant to the settlement statements for the loan.

6. At the closing, the Debtors received a blank form Notice of Right to Cancel the loan transaction pursuant to TILA and Regulation Z under TILA, 12 C.F.R. § 226.23.

7. On August 28, 2003, the Debtors completed and signed the Notice of Right to Cancel. Debtor Judith Thayer sent the cancellation form to American Residential via certified mail, to the address for American Residential noted in the form.

8. On August 29, 2003, an employee or agent of American Residential signed the return-receipt form for the certified mailing. That form was duly returned to the Debtors by the United States Postal Service.

9. Sometime during the day of August 29, 2003, River Town Title proceeded to disburse the funds from the closing, by sending checks to the recipients designated in the settlement statements. Of these funds, $151,061.76 was disbursed to TCF. $8,548.34 was disbursed to Discover Card, an unsecured creditor of the Debtors. Both of these creditors received their checks and promptly negotiated them in due course.

10. When the employee or employees of River Town Title issued and forwarded these checks, they were unaware that the Debtors had signed the cancellation form or that American Residential had received it.

11. On August 29, 2003, River Town Title also issued a check in the amount of $4,093.46 to Debtor Bradley Thayer, for the balance of American Residential's advance net of transactional costs. After the Debtors received this check, they returned it to American Residential.

12. In September 2003, Debtor Judith Thayer forwarded a check for $1,187.00 to TCF, purportedly in payment of the Debtors' current monthly payment obligation on the TCF note.

13. Under an unsigned and machine-generated letter dated September 17, 2003, TCF's customer service department returned the check to the Debtors, with the statement "[t]his check is being returned due to the above-referenced loan number being paid in full."

14. At some point, TCF sent the Debtors a document entitled "Final Escrow Account Disclosure Statement," dated September 8, 2003. By its terms, this document purported to cover monthly transactions on a mortgage-related escrow account for the payment of the real estate taxes and insurance during a period from June, 2003 through June, 2004. This form shows a zero balance in the account as of October, 2003.

15. On September 30, 2003, Paul A. McColley, a vice president of TCF, acknowledged and executed a satisfaction of the TCF mortgage. Under cover of a machine-generated and unsigned letter dated October 2, 2003, this document was sent to River Town Title. This document has never been filed in the public land records.

16. At some point, Debtor Judith Thayer received a letter from one Sharon Thielman, a "Payoff Specialist" in TCF's payoff department. Addressed to "To Whom it May Concern," and dated February 5, 2004, this letter recites:

> The above mentioned loan was paid in full *SEPTEMBER 2, 2003*. A satisfaction/release of mortgage was mailed to

the party that remitted the payoff funds. At that time, the satisfaction/release of mortgage should have been taken to the County Recorder's Office and recorded removing the lien from the property.

17. At some point after receiving the cancellation document from the Debtors, an employee of American Residential "contacted TCF ... to recover the payment erroneously sent to TCF." [7]

18. Ultimately—it is not disclosed when—American Residential and TCF agreed that the funds previously transferred to TCF would serve as the consideration for American Residential's purchase of TCF's rights under the TCF note and TCF mortgage.

19. On February 18, 2004, McColley, on behalf of TCF, acknowledged and executed an assignment of the mortgagee's rights under the TCF mortgage and mailed it to Weinberg.

20. On February 23, 2004, one Fred R. Ojile, on behalf of River Town Title, sent Weinberg a check for $4,093.46 to cover the funds from the refinancing that the Debtors were to have received. Ojile stated his understanding that Weinberg had "taken steps to address the resulting payoff for the first mortgage to TCF Mortgage Corporation and the outstanding obligation to the new mortgage."

21. On July 29, 2004, McColley, on behalf of TCF, executed a document entitled "Assignment of Note and Collateral Documents," again referencing the TCF note and mortgage and again identifying American Residential as the recipient of the rights under these instruments.

22. From August 29, 2003 through the end of 2004, American Residential paid all current obligations on real estate taxes and insurance on the subject real estate, as they became due, for a total $4,459.72.

The Debtors never tendered any payment on these obligations. They never protested American Residential's advances for the payment.

## DISCUSSION

### Introduction

At the outset, a few observations about counsel's performance are warranted. American Residential's complaint was relatively straightforward in identifying both theory of suit and requests for relief. The Debtors' answer, however, might fairly be characterized as taking a "shotgun" approach to the defense. Their attorney pleaded 23 separate "affirmative defenses" to American Residential's theories of recovery. He went on to plead three counts of counterclaims, founded on many of the same concepts as the pleaded affirmative defenses.

Count III of the counterclaim is not implicated by the current motion, having been squarely terminated by dismissal on American Residential's motion. Counts I and II are the flip-side of Count I of American Residential's complaint. The Debtors seek a determination that their residence is free and clear of the TCF mortgage, on account of a purported payment of the underlying debt and release of the mortgage. They also seek an affirmative injunction against American Residential, to compel it to record the satisfaction document to clear the property's record title of the TCF mortgage. The factual and legal predicates of this counterclaim, however, are virtually identical to those for the Debtors' affirmative defenses; even the key words within the counterclaims' text are retreads of those pleaded for the affirmative defenses.

---

7. The wording here is that of Ann Weinberg, American Residential's Operations Manager,   per the affidavit she submitted for these motions.

In oral argument on the motions at bar, the Debtors' counsel kept whipsawing back into a frame of reference that envisioned his clients as still being entitled to some form of affirmative relief under TILA in their own right, and then went beyond that. His densely-worded but truncated arguments seem to contemplate an intertwining of his clients' TILA-based rescission, *and* an extinguishment of their liabilities under the original TCF transaction. Between the briefing and the argument, the presentation was very confusing.

Given the nature of longstanding jurisprudence under TILA, almost *sui generis,* not to mention the very specialized jargon used in that corner of the legal practice, this has complicated the job of giving attention to this matter. American Residential's counsel did not make this any easier by latching on to a point or two of the Debtors' in oral argument, characterizing them as concessions to which her client could agree, and then incorporating those points to alter the previously-briefed analysis that she urged the Court to adopt.

After much review and cogitation, however, the initial tack for this motion emerges as the best one, and not just because it is so simple as to be elegant.[8] It also is most resonant with a principled construction of TILA and a sense of proper conse-

quences, individual responsibility, and fundamental fairness. Given the rather dense brush of theory that both sides fertilized around it, this figurative clearing in the woods took a while to recognize—as close as it was in the first place.

### Issues

These two motions present a total of six substantive issues. The first five go to Count I of American Residential's complaint; the last one goes to Count II. There is a seventh issue, one of procedure and judicature, that neither side recognized in presenting the motions.

### 1. Effectiveness of Debtors' Rescission Under TILA (Count I)

At the outset of this adversary proceeding, it was not clear whether the threshold legal point was in controversy. That point, of course, was whether the Debtors had effectively rescinded the August, 2003 refinancing transaction as they were allowed to do under TILA. In paragraph 11 of its complaint, American Residential seemed to concede the point to the Debtors.[9] Somewhat paradoxically, the Debtors seemed to deny the point in their "Eleventh Affirmative Defense"—or, at least, they denied that their actions in August, 2003 had had the substantive results to which they were entitled under TILA.[10]

---

8. The applicable guideline for logic is known as Occam's razor, or "the law of parsimony": "... the simplest of competing theories is preferable to the more complex ones, or ... the parts of an argument should never be multiplied any more than necessary." Bryan A. Garner, *A Dictionary of Modern American Usage* at 463 (1998). While current law school indoctrination and gun-shyness about professional liability lead lawyers to honor this aspiration in grossest breach, the courts must heed it. It is both a useful tool for adjudication and a socially-responsible expedient: simple but principled solutions to legal controversies usually give better, more comprehensible guidance for future conduct and future litigation alike.

9. The language that indicates this is:

On August 28, 2003, pursuant to 12 C.F.R. § 226.23 (Regulation Z), both Defendants rescinded the new ARM loan by signing the Notice of Right to Cancel provided to each of them at the loan closing and mailing the cancellation to ARM at the address provided in the notice.

10. The language that creates this doubt is the Debtors' allegation that "[American Residential's] attempts to 'unwind' and/or 'assign' and enforce the TCF note and TCF mortgage ... impermissibly interfere with [the Debtors'] rescission rights" under TILA.

This point was settled when these motions were presented. In American Residential's briefing, its counsel reiterated, "[t]here is no dispute that the Cancelled Loan"—i.e., that applied for via the August, 2003 refinancing—"was properly rescinded." While the phrasing in the passive voice is unfortunate, this is clearly a statement of continuing concession to the Debtors on the threshold point, that the Debtors had taken all steps that TILA had required of them to rescind the August, 2003 refinancing transaction. The Debtors' counsel rejoins with an accusation that American Residential nonetheless violated TILA contemporaneously with the rescission or soon thereafter, when River Town Title disbursed funds as had been originally contemplated under the aborted refinancing. However, this accusation is only so much dithering; it does not really address the isolated point that must be treated first for the overall analysis. And, in the last instance it is just plain wrong as a matter of substance.

The Debtors did everything they had to in order to rescind the August, 2003 refinancing. Under TILA, this triggered certain obligations in American Residential; and if American Residential did carry those out, the question is, where this leaves the parties now.

### 2. American Residential's Duties, in the Wake of the Debtors' Rescission (Count I)

When a would-be borrower rescinds under TILA, the outcome is to be "a return to the *status quo ante*" the rescinded credit transaction. *In re Buckles*, 189 B.R. 752, 765 (Bankr.D.Minn.1995). Consonant with the notion of rescission under general principles of equity, the statute requires the parties to be returned to the positions they held prior to entering the transaction, as much as possible. *Williams v. Homestake Mortgage Co.*, 968 F.2d 1137, 1140 (11th Cir.1992). It was American Residential's duty to see that this was done.

But to analyze the sufficiency of a would-be lender's response to a borrower's rescission under TILA, one first must identify the *status quo ante*. Here, the answer actually is simple. As to the Debtors, they had been obligated as debtors under the TCF note, to whatever party held the rights of the creditor under that note, with their homestead serving as collateral security via the TCF mortgage. Under American Residential's posture, of course, it would keep the value of all of the monies that otherwise had been committed for disbursement on the Debtors' account, under the terms of the aborted refinancing.[11] Contractually and legally, post-rescission and under the structure of the *status quo ante*, American Residential would be a figurative stranger to the Debtors; it would hold the status of neither creditor nor mortgagee in relation to them or their residence.

This is easy enough to spell out in the abstract. But here, we have the complication that certain agent-participants had gone ahead to act on the basis of the arrangements for the refinancing, unknowing and unheeding of the Debtors' exercise of rescission. *In form*, and immediately after they were effected, the results of

---

11. Under the parties' pleadings, this is not a case in which the period of time for a borrower to exercise a right of rescission was extended due to a lender's initial failure to make full disclosure of the costs of credit as TILA requires. *Cf. In re Buckles*, 189 B.R. at 763 (applying 15 U.S.C. § 1635(f)). In such a case, where the borrower later rescinds a credit transaction after he has performed by making payment per its terms for a period of time, the parties' rights and duties to make adjustments to resolve their status get more involved. *In re Buckles,* 189 B.R. at 763–767.

those actions were inconsistent with the outcome that TILA would have dictated.

Contrary to the Debtors' argument, however, the fact of the payouts and even the signing of the release of mortgage are not relevant to the question of whether the Debtors were given the benefit of their rescission. The important points are that American Residential has never tried to hold them to personal liability under the August, 2003 American Residential note; it has never recorded the August, 2003 American Residential Mortgage; and it does not assert a lien against their residence under the instrument that the Debtors signed to grant that mortgage in connection with the refinancing that they later undid. At least in the litigation of Count I of its complaint, and as to the Debtors, *American Residential* has treated the August, 2003 refinancing transaction as a nullity. That is the necessary consequence of its concession on the validity of the Debtors' act of rescission, and American Residential accepts that consequence. Perforce, American Residential has discharged its specific duties to the Debtors in consequence of the rescission.

To the extent that the parties' positions are structured by TILA, the Debtors have no right to demand more than that. Their remedy of rescission lies only against the financial and legal burdens that they otherwise would have had to shoulder under the terms of the refinancing. The rescission worked a spring-back to the state of things as they stood right before the Debtors executed the documents for the refinancing. American Residential agrees to that.

### 3. Legal Vitality of De Facto Disbursement to TCF and Execution of TCF Release, Given Debtors' Rescission (Count I)

The next issue is the consequences of the actual events during the crucial period that spanned the Debtors' execution and mailing of the notice of cancellation, American Residential's receipt thereof, River Town Title's disbursement of funds, and TCF's issuance of the satisfaction of mortgage.

The latter two acts, of course, were nominally done in consummation of the refinancing, and they would have fulfilled expectations structured by the refinancing's terms. Had the refinancing gone through as planned, these acts of satisfaction and release, of debt and lien alike, would have been on the Debtors' account, and to their benefit; they would have relieved them of a large personal debt obligation under contract, and their real estate of a major encumbrance under mortgage.[12] These two acts were essential to a process of refinancing that had been carried entirely on the Debtors' initiative. Though they were to be performed by third parties, this was to be only on the Debtors' personal authorization, or in consequence of that.

*The act of rescission withdrew that authorization,* whether the effective date of the rescission is deemed to have been on the execution, the mailing, or the receipt of the notice of cancellation.[13] There is no evidence that either the employees of River Town Title or TCF through McColley were contemporaneously aware of the rescission.[14] Nonetheless, as to the TCF note and mortgage, there was no active

---

**12.** Yes, the Debtors and their property would have received different burdens under the new loan and mortgage, in substitution. That, of course, is what "refinancing a mortgage," per current jargon, is all about. But it is irrelevant to the point at bar.

**13.** The necessary corollary to American Residential's concession on the effectiveness of

the rescission is that it took place upon the signing or the mailing of the document, since both of those took place within TILA's three-day window. Nobody has made an issue of this.

**14.** And, hence, it is found that they were *not* aware of it when they performed their respective acts. To the extent that the Debtors ini-

and binding authority from the Debtors to accomplish or support either of the legal consequences of debt satisfaction or lien release, when they were ostensibly brought about by those persons' acts.

### 4. Binding Status of American Residential's and TCF's Recharacterization of Their Part of the Refinancing Transaction (Count I)

Absent a legally-effective grant of authority from them to disburse borrowed funds on their behalf and to their benefit, the Debtors really have nothing to say about the initial characterization of the disbursement that River Town Title made to TCF; the way in which TCF credited it upon receipt; or the way that American Residential and TCF ultimately agreed to recharacterize the disbursement and the receipt and their consequences. The money was delivered and received when it was as the result of *a mistake*. The law cannot ignore that. And this inadvertency was

brought about in the first place by the way in which the Debtors chose to communicate their rescission to American Residential and the timing of that communication, against the backdrop of an expedited and standardized commercial process executed en masse across the country to the benefit of lenders and consumers alike.[15] It is irrelevant to the Debtors' rights under TILA how American Residential and TCF now consider that transaction, what legal character they chose to attach to it, or how they memorialized the result of that later resolution. The Debtors got what they wanted, i.e., *out* of the obligations under the refinancing. Nothing of the rest was or is within their legal interest, control, or direction.

Thus, despite the contemporaneous form or the content of any party's later communications about the nature of the receipt and application to the Debtors or anyone else,[16] American Residential and TCF are

---

tially suggested some sort of cabal or orchestrated fraud, it was their burden under Rule 56 to produce some evidence on which to base findings to that effect.

**15.** This observation is intended to be judgment-neutral about the mode and timing of rescission that the Debtors elected. American Residential has not made an issue of the way the Debtors deferred action to the third and final day of the statutory rescission period. Nor does it take the Debtors to task for choosing a delivery medium—the U.S. mail—that was guaranteed to delay actual notice to American Residential by one full business day at minimum. All this happened in an environment where the potential daily accrual of interest on new and ·old obligations made swift consummation of the refinancing both prudent and beneficial to all parties. (American Residential has pointed to the business and legal considerations that motivate speed in the disbursement process, as a general industry practice.) The Debtors' counsel tries hard to impugn American Residential and its agent River Town Title over their alleged failure to defer the disbursement for some "reasonable" period of time to allow transmission

and delivery of a notice of cancellation mailed at the last minute. He cites Federal Reserve Board staff commentary on Regulation Z to that effect, i.e., *Commentary to* 12 CFR §§ 226.15(c)–1 and 226.23(c)–4, and he insists that this commentary has the force and effect of law. (For the latter proposition, counsel cites *Household Credit Servs., Inc. v. Pfennig*, 541 U.S. 232, 237–240, 124 S.Ct. 1741, 1746–1747, 158 L.Ed.2d 450 (2004) and *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565, 100 S.Ct. 790, 63 L.Ed.2d 22 (1980).) This is a non-issue for this adversary proceeding, however, because the acts of erroneous disbursement and receipt have nothing to do with honoring a consumer's proper expectations as a rescinding borrower under TILA.

**16.** The reference here is to the various notices and letters from TCF that the Debtors received from September, 2003 through February, 2004, at their direct request or otherwise. Founded as they were on the same mistake that led to the general mess at bar, they can be given no more binding effect than law or equity dictates, on a consideration of *all* of the circumstances.

now entitled to the benefit of whatever legal characterization they attached to the events. They had the right to resolve the very anomalous positions they were put into on August 29, 2003, in a way to minimize prejudice to their ultimate financial realization.

Thus, TCF properly assigned its rights under the TCF note and mortgage, however those rights were postured at any relevant point. And American Residential currently holds those rights, whatever they are.[17] In consequence, it may now advance and enforce them in any appropriate way.

## 5. Present Status of American Residential's Rights as Creditor—and Mortgagee–Assignee of TCF (Count I)

■ The last substantive issue raised by American Residential's motion is the import of the release of mortgage that McColley issued under TCF's auspices, approximately one month after the Debtors effected their rescission.

■ Under the earlier holding, any basis for the Debtors to actually compel a release of the mortgage was vitiated when they rescinded the refinancing transaction. A contractual and causal string was severed at its other end. This left the resultant benefit to the Debtors (the freeing of the property from the encumbrance of the TCF mortgage) unmatched by the corresponding value that had been previously committed under contract to that received benefit (the payoff of the TCF note via funds chargeable to the Debtors' account, and the attachment of the American Residential Mortgage, to secure the loan that funded the payoff). When the Debtors

withdrew American Residential's authority to provide the consideration, TCF was deprived of its warrant to provide its part in the refinancing's consummation.

However, in mistaken reliance on a legal state of affairs that had evaporated, McColley acted, and TCF issued a document that nominally released the lien.

On the undisputed transactional facts, and absent development of evidence to the contrary from the Debtors, these are "circumstances authorizing an inference of a mistake of fact" on TCF's part, i.e., that American Residential had received its due from the Debtors under the refinancing and that full value had been exchanged through a consummated transaction. *Heisler v. C. Aultman & Co.*, 56 Minn. 454, 57 N.W. 1053, 1054 (1894). Thus "equity will presume such a mistake" led to the erroneous execution of the satisfaction of the mortgage. *Id.* This authorizes the application of equitable remedies in favor of the party that "paid money due on a mortgage," "for the purpose of effecting substantial justice." *Id.* Among those remedies is judicially-effected subrogation to the rights of the last nominal holder of the released mortgage, *id.*—though that is unnecessary here, due to the TCF–American Residential assignment.

But the remedy that can be granted is the cancellation and annulment of the erroneously-generated satisfaction. *Heisler*, 57 N.W. at 1053. Minnesota has long made equitable relief available to mortgagees that did not receive their contractual due in payment of debt and also lost the record status, attachment, or priority of

---

17. The Debtors' counsel repeatedly made summary accusations that the assignment was "invalid or has nor [sic] force and effect." (The quoted language is from paragraph 69 of the Debtors' "Joint Answer and Counterclaims.") However, he has not raised lack or insufficiency of consideration, illegality as a

matter of state law, or any other legal or factual impediment to the enforceability of the assignment, *as between TCF and American Residential*. Nor did he produce any authority for his insinuation that the assignment was somehow void, as in derogation of TILA's provisions for rescission.

their collateral security rights via the mistaken issuance of a written satisfaction of mortgage. *Geib v. Reynolds,* 35 Minn. 331, 28 N.W. 923 (1886) (Wm.Mitchell, J.) (where first mortgagee receives new note and mortgage in refinancing of original loan, junior mortgages later attach before first mortgage is satisfied of record, and original mortgagee releases first mortgage of record, court may "infer that he would not have made this release had he known of these intervening liens," may deem the release to have resulted from excusable mistake, and may "restore the lien of the first mortgage, and give it its original priority"); *Woolson v. Kelly,* 73 Minn. 513, 76 N.W. 258 (1898) (where mortgagee's successor-in-interest mistakenly executes satisfaction of mortgage and files it for record years after original loan but before underlying debt is paid in full, instrument of satisfaction itself was never physically delivered to mortgagor or his successors-in-interest, and mortgagor's successors-in-interest "have [n]ever parted with a dollar on the faith of the record of the satisfaction," equity will lie to cancel the recorded satisfaction and allow foreclosure of mortgage upon default).

These Minnesota authorities may be hoary with years, but they are still good law; and each one bears on some aspect of these parties' dispute over the viability of the unrecorded satisfaction that McColley issued.

First: it is not only safely inferred that McColley would not have satisfied the TCF mortgage had he known of the Debtors' rescission; it is the only possible inference. One simply cannot conceive of a

participant in the high-volume consumer mortgage loan origination industry doing otherwise; that industry is utterly dependent on all successive creditor-mortgagees being accountable and responsive to each others' security rights, as large sums of money are shunted back and forth very quickly.[18] Since McColley did not know— another inference unchallenged by the Debtors—his execution of the satisfaction is laid properly and solely to mistake of the sort that is fully subject to remedy in equity.

Second: there is nothing to show that the Debtors or anyone else have ever relied on an actual, final, and binding release of the TCF mortgage, in good faith and to their real-life economic detriment. (Any forbearance from taking ongoing responsibility for the other cyclical financial burdens of real estate ownership—payment of real estate taxes and homeowner's insurance premiums—took place long after the Debtors had locked themselves into their adverse position against American Residential. Thus, these acts are to be attributed solely to litigation strategy on advice of counsel—or even to a crass exploitation of the ongoing ambiguity.)

Third: the written satisfaction was never delivered to the Debtors, or put of record.

And fourth: American Residential, having found itself in an untenable position of exposure, had to deal somehow with the situation. It could not compel the Debtors to follow through on the refinancing, or otherwise receive its satisfaction through that undone deal. Nonetheless, it had to

---

**18.** The Debtors did not produce a bit of evidence to suggest anything else could have happened. When presented with an inference that is undeniably plausible in light of strong and uncontroverted basic facts and common human experience, the proponent of a contrary inference has an affirmative burden of production—and it will lose to the

making of the inference if it does not carry this burden. E.g., *Mayer v. Nextel West Corp.,* 318 F.3d 803, 807 (8th Cir.2003); *Yarborough v. DeVilbiss Air Power, Inc.,* 321 F.3d 728, 733 (8th Cir.2003); *In re Mathern,* 137 B.R. 311, 319, 322 (Bankr.D.Minn.1992), *aff'd,* 141 B.R. 667 (D.Minn.1992).

confront TCF, which had not contributed to the anomaly and which had every strategic reason to insist on keeping the funds it had taken in hand while not knowing of the mistake. The chosen accommodation was to take the assignment from TCF, and to then pursue the Debtors when they decided to attempt a wash through bankruptcy. American Residential was fully within its rights in doing that through this adversary proceeding, and in seeking its vindication on its secured position.[19]

Under the authority cited, substantial justice requires that the unrecorded satisfaction be cancelled and annulled. American Residential has proved its right to judgment on Count I of its complaint, as a matter of law.

### 6. Dischargeability of Debt, As It Relates to Outcome on Count I (Count II)

American Residential did not move for summary judgment on the dischargeability

claim of Count II of its complaint. However, the Debtors did make a motion on that count.[20] The sole argument cursorily briefed by the Debtors is that "Count II seeks a denial of discharge on the TCF note," and if the ruling on Count I was that "the TCF note has been paid and extinguished the issue of discharge becomes moot."

This theory is entirely off-base. In Count II American Residential seeks a determination of nondischargeability as to any debt incurred by the Debtors "in connection with the Cancelled Loan," which is earlier defined as any obligation incurred in connection with the August, 2003 refinancing. Because American Residential's counsel did not move for summary judgment on this Count, it has not yet presented a specific theory of suit under dischargeability law.[21] But it is utterly clear that American Residential does not posit the Debtors' *original debt to TCF* as non-

---

**19.** American Residential's counsel did not argue this specific theory to support her client's request for relief; nor did she cite this case-law precedent. However, they are what dovetails to the established facts. They deal quite conclusively with the Debtors' intense, heated, but ultimately vapid argument, based on the law of negotiable instruments: that the mere act of TCF's negotiation of River Town Title's check conclusively satisfied the Debtors' debt under the TCF note and thus vitiated the TCF mortgage. Giving unassailable effect to the mere surface of pieces of paper, as the exploitation of a "technicality," might be an unversed layperson's notion of successful legal argumentation. The actuality is deeper and more nuanced, particularly when the manipulator of such shallow posturing would get an unjust windfall. That is where equity lies, to look beyond. The Debtors did not pay off the TCF note; so in equity they are not entitled to the benefit of any application of funds to the underlying debt. And, at a deeper level, the point is diametrically opposed to the fundament of the Debtors' theory of suit, that their rescission of the refinancing was effective. This is a point of simple general logic, rather than legalities: if the Debtors undid

the refinancing, where, precisely, did the money come from that they would have credited to their account on the TCF note so as to entirely satisfy *their debt on it?*

**20.** Their counsel inconsistently labeled it as a motion "to dismiss ... pursuant to Bankr. Rule 7056 and Fed.R.Civ.P. 56(b)."

**21.** Among other things, it is unclear whether American Residential seeks nondischargeability as to any obligation of the Debtors that is related to the amount of money it paid to TCF. Since American Residential agreed with TCF to recast that payment as the consideration for the assignment of TCF's original rights against the Debtors and the real estate, it is not clear how American Residential would now make out a debt that ran directly from Bradley Thayer to it on account of that disbursement transaction. However, in her "objection" to the Debtors' motion American Residential's counsel indicated that her client would at least pursue him on an asserted liability stemming from the disbursement to Discover Card. The specific theory to make out an enforceable debt on that basis is not yet articulated.

dischargeable in its inception, and that it does not seek relief as to the obligations stemming from that original loan. Since the Debtors' notion of mootness via ostensible payment goes entirely to that debt, and the dischargeability of that debt is not even in suit, there is no basis to terminate American Residential's litigation of Count II now—whether by "dismissal" or by summary judgment.

### 7. Fruition of Relief Via Entry of Judgment at Present

American Residential moved for summary judgment on only one of the two counts of its complaint against the Debtors. It has been granted judgment on that one count. Under Fed.R.Civ.P. 54(b),

[w]hen more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.

This Rule is made applicable to this adversary proceeding by Fed. R. Bankr.P. 7054(a).

■ The purpose of this Rule is to promote judicial economy, by discouraging piecemeal appeals. *United States v. Nixon,* 418 U.S. 683, 690, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Orion Fin'l Corp. v. American Foods Group, Inc.,* 201 F.3d 1047, 1049 (8th Cir.2000). Thus, before a trial court makes a so-called "Rule 54(b) certification" to allow entry of a judgment on some of the claims in suit while leaving others for later resolution, it must make an express, "clear and unequivocal" determination of "no just reason for delay." *Goodwin v. United States,* 67 F.3d 149, 151 (8th Cir.1995). The appellate courts have committed this to the trial court's discre-

tion. *E.g., Interstate Power Co. v. Kansas City Power & Light Co.,* 992 F.2d 804, 807 (8th Cir.1993).

■ However, the certification does turn what otherwise would be considered an "interlocutory" determination not appealable of right to one that would become final and forever binding absent very prompt resort to appellate remedies. Thus, the court must consider several factors before making it. *Speer v. City of Wynne,* 276 F.3d 980, 987–988 (8th Cir. 2001). The court "must consider both the equities of the situation and 'judicial administrative interests,' particularly the interest in preventing piecemeal appeals." *Interstate Power Co. v. Kansas City Power & Light Co.,* 992 F.2d at 807.

■ The disposition of Count I does not resolve all of the disputes in suit in this adversary proceeding. However, the two disputes are very different from each other, the one under Count I being *in rem* and the one under Count II being *in personam.* Given its business, American Residential has every justifiable interest in the prompt enforcement of the *in rem* rights now adjudicated under Count I, via foreclosure of its mortgage and liquidation of the collateral. These *in rem* rights are its best likelihood of prompt recovery right now, given the expedited procedures for foreclosure by advertisement under Minnesota law versus the relative uncertainties and substantive limitations of carrying dischargeability litigation forward. With the lapse of time, the most just thing is to set the separate adjudication of these distinctive *in rem* rights on the track for earlier finality, rather than to await the outcome of further months of litigation and trial on a dischargeability count that has not yet had a very precise articulation on the record. *See Orion Fin'l Corp. v. American Foods Group, Inc.,* 201 F.3d at 1049 (purpose of Rule 54(b) certification is to provide opportunity to appeal as to is-

sues decided); *In re Strong,* 293 B.R. 764, 768 (8th Cir. BAP 2003).

So, there is no just reason for delay. Judgment should be entered now, to promote American Residential's early recovery on the collateral that it had to buy back as a result of the Debtors' eleventh-hour exercise of their rights under TILA.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED:

1. The Plaintiff's motion for summary judgment on Count I of its complaint is granted.

2. The Defendants' motion for summary judgment on Count II of the Plaintiff's complaint is denied.

3. As the assignee of TCF Mortgage Corporation, Plaintiff American Residential Mortgage, LP holds a valid, perfected, and enforceable mortgage against certain real estate in Washington County, Minnesota, under the document filed for record on November 13, 2002 as Document No. 3277617 in the Office of the County Recorder and Registrar of Titles for Washington County, Minnesota.

4. Having been executed as the result of mistake, the instrument entitled "Satisfaction of Mortgage" signed on behalf of TCF Mortgage Corporation by one Paul A. McColley on September 30, 2003, which purports to relate to the mortgage described in Term 3, is cancelled and annulled, and shall have no legal force or effect.

There being no just reason for delay, LET JUDGMENT BE ENTERED ON TERMS 3 and 4.